**[Cite as *State v. Jali*, 2020-Ohio-208.]**

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28294 |
| | : | |
| v. | : | Trial Court Case No. 2018-CRB-3885 |
| | : | |
| ABDALLA S. JALI | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 24th day of January, 2020.

. . . . . . . . . . .

AMY B. MUSTO, Atty. Reg. No. 0071514, Assistant Prosecuting Attorney, City of Dayton Prosecutor's Office, 335 West Third Street, Room 372, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee

ADAM JAMES STOUT, Atty. Reg. No. 0080334, 5335 Far Hills Avenue, Suite 109, Dayton, Ohio 45429
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant/Appellant, Abdalla S. Jali, appeals from his conviction on one count of solicitation following a jury trial in Dayton Municipal Court. Jali contends that his conviction was based on insufficient evidence because the police entrapped him into committing the offense. He also argues that the conviction was against the manifest weight of the evidence. Finally, Jali contends that the trial court erred in failing to allow him to introduce Defendant's Exhibit A into evidence.

{¶ 2} For the reasons that following, Jali's assignments of error are without merit and are overruled. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 3} On June 29, 2018, a complaint was filed in Dayton Municipal Court, charging Abdalla Jali with solicitation in violation of R.C. 2907.24(A)(1), and loitering in violation of R.C. 2907.241(A)(2). Both crimes were third degree misdemeanors. The charges against Jali arose from a June 28, 2018 prostitution sting operation that was conducted in the 900 block of North Main Street in Dayton, Ohio. The area in question is commercial and residential and is known as a high prostitution area. Previously, citizens and area businesses had made several complaints to the police about heavy prostitution.

{¶ 4} On June 28, 2018, Dayton Police Officer Alaina Hammond was working undercover as a decoy in the street crimes unit. Hammond had received training from other police officers on how to act as a prostitute and had also observed prostitutes. Essentially, Hammond was to make eye contact with drivers or with people who walked by. She was also to walk back and forth in a specific area and speak with others if they spoke to her.

{¶ 5} Hammond arrived at the scene at about 10:00 a.m. Also present was Dayton Police Detective Mistan Bailey who was acting as an interviewing detective for this operation. Bailey was located about a block away and monitored interactions between Hammond and potential subjects, for safety purposes. After each interaction, Bailey contacted the subjects and interviewed them about what had happened. The interactions themselves were not recorded.

{¶ 6} At around 3:30 p.m., Hammond encountered Jali at Vista Place on North Main Street, at the intersection of Warder Street. When Hammond first noticed Jali, he was walking toward her on foot. Jali called out a greeting to Hammond, and she greeted him back, saying, "Hi, how are you?" At this point, Hammond was maintaining her typical activity of walking back and forth and also looking at vehicles. Hammond was standing on the northwest corner of North Main and Warder Street, and Jali continued to walk toward her. Jali then sat down on a bench at a nearby bus stop.

{¶ 7} According to Hammond, Jali sat back on the bench in an inviting manner, leaning back, with a smile on his face. Jali had his arm up and he patted the bench next to him, saying, "Come here - I can't hear you." At that point, Hammond crossed Warder Street and sat down next to Jali. Jali asked Hammond what her name was, and she introduced herself and asked for his name. Hammond believed Jali had introduced himself as Dali, but he corrected her and said, "No, Jali." Transcript of Proceedings ("Tr."), p. 58.

{¶ 8} Jali asked Hammond what she was doing, and she said, "I was just hanging out." *Id.* When Jali asked her what she did, she repeated that she was just chilling. At that point, Jali asked if she had a boyfriend. According to Hammond, people often ask if

she has a boyfriend when she is being solicited. When Hammond said that she did not have a boyfriend, Jali asked if she wanted to go with him. Because that phrase could have several meanings, Hammond asked Jali what he meant. Jali then sort of smiled and said, "You know what I want." *Id.* at p. 60.

{¶ 9} At that point, Hammond asked Jali directly what he wanted, and he very clearly replied, "Sex I was thinking." *Id.* Hammond then said, "OK, how does twenty dollars sound?" *Id.* In response, Jali said, "Not too much." *Id.* As Jali said this, he was kind of looking away, so Hammond asked Jali if he had said that was too much. Jali then said, "No that's not too much." *Id.*

{¶ 10} Because Jali had provided Hammond with what she needed for an arrest, she told him that she was going to gather her things and come back. Jali said "OK," and Hammond then gave the predetermined signal to her team to arrest Jali. When an arrest is made, the arrestee is moved to another area and the police continue with operations.

{¶ 11} After the signal was given, marked units stopped Jali and he was moved to a separate location so that Detective Bailey could speak with him. When Bailey attempted to give Jali *Miranda* warnings, he told her that he needed an interpreter. One was not available, but Jali was able to provide Bailey with some basic information like his name, date of birth, and address.

{¶ 12} Jali was a refugee from Sudan and had lived in the United States for five years. He testified at trial and had an interpreter. Jali said that he did not speak English when he arrived in the United States, but did speak some English by the time of trial. However, he usually spoke Arabic.

{¶ 13} According to Jali, he left his home on the day of the arrest and was on the

way to a garage where his car was being fixed. To get there, he needed to take the bus. He met a woman (Hammond) near the bus stop, who made eye contact when he was sitting on a bench at the bus stop. Hammond came closer and was smiling at him and batting her eyelashes. After he said hi, and she responded, she came and sat next to him, flirting and touching her hair. Jali claimed that Hammond was talking too much and he could not understand what she was saying.

{¶ 14} According to Jali, Hammond asked if he had a girlfriend and he said no. He then asked if she had a boyfriend. Jali stated that he did not even know what a prostitute was and had never encountered prostitutes before. However, he admitted that he did ask Hammond if she would be interested or willing to have sex.

{¶ 15} Jali denied talking about money or trying to pay Hammond. He testified that Hammond mentioned 20 pounds[1], and said he did not know what she meant. Jali also stated that Hammond touched her cheek, and he did not know if she meant that he should kiss her cheek. Additionally, Jali testified that he told Hammond that "twenty" was too much, as he thought she meant 20 kisses. Jali further said that he never tried to give Hammond any money. He stated that he was hoping "she would just have sex with [him], as people do." Tr. at p. 96.

{¶ 16} Hammond then said she was going to get something, and Jali thought if the bus showed up, he would just leave. Around two minutes later, the police came and arrested him.

{¶ 17} As noted, after his arrest, Jali was charged with one count of solicitation and one count of loitering. The trial court subsequently granted Jali's motion to preclude the

---

[1] Jali referenced pounds, rather than dollars, during his testimony.

jury from hearing a statement another officer made at the scene about Jali having had a prior incident of picking up a prostitute. The court also granted the State's motion to present evidence of prior police reports and a 911 call by Jali. Specifically, the court held that evidence about these incidents could be presented if Jali raised his language proficiency as a defense or when examining a State witness.

**{¶ 18}** The jury trial was delayed a number of times, but was eventually held on January 10, 2019, with interpreters present. At trial, the State presented testimony from Bailey and Hammond, and a rebuttal witness. Jali testified on his own behalf. The jury then found Jali guilty of soliciting but not guilty of loitering. Ultimately, the trial court sentenced Jali to 60 days in jail, with 60 days suspended, one-year of probation, with the first six months being supervised and the remaining six months being non-reporting, 30 hours of community service, HIV testing, and costs and fines totaling $1,115.

**{¶ 19}** Jali now appeals from his conviction.

## II. Sufficiency and Manifest Weight of the Evidence

**{¶ 20}** Jali's First Assignment of Error states that:

> The Conviction for Solicitation Was Without Sufficient Evidence Because the Officer Entrapped Mr. Jali into the Solicitation Charge.

**{¶ 21}** Under this assignment of error, Jali contends that his conviction was based on insufficient evidence and was against the manifest weight of the evidence because he was induced to solicit the undercover officer.

**{¶ 22}** "A person is not guilty of a criminal offense unless (1) the person engaged in conduct that a section of the Revised Code prohibits and (2) acts with the requisite

degree of culpability for each element as to which a culpable mental state is specified by the section defining the offense." *State v. West*, 2d Dist. Montgomery No. 22966, 2009-Ohio-6270, ¶ 17, citing R.C. 2901.21(A). "The burden of proof for all elements of the offense, beyond a reasonable doubt, is on the prosecution." *Id.*, citing R.C. 2901.05(A).

{¶ 23} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). In this situation, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted). *Id.* at paragraph two of the syllabus.

{¶ 24} Contrastingly, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. In this situation, a court reviews " 'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving

conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *Accord State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 193. "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61 and 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 25} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 58 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 26} Jali was convicted of soliciting under R.C. 2907.24(A)(1), which provides that "No person shall solicit another who is eighteen years of age or older to engage with such other person in sexual activity for hire." " 'Sexual activity for hire' means an implicit or explicit agreement to provide sexual activity in exchange for anything of value paid to the person engaging in such sexual activity, to any person trafficking that person, or to any person associated with either such person." R.C. 2907.24(E)(2). " 'Solicit' is

defined as 'to entice, urge, lure or ask.' " *State v. Swann*, 142 Ohio App.3d 88, 89, 753 N.E.2d 984 (1st Dist.2001), quoting 4 Ohio Jury Instructions Section 507.24 (1997).

{¶ 27} "To establish a violation of R.C. 2907.24(A)(1), the State must prove (1) the accused's solicitation of another, (2) to engage in sexual activity, (3) for hire." *State v. Short*, 2d Dist. Montgomery No. 27192, 2017-Ohio-7200, ¶ 28, citing *West*, 2d Dist. Montgomery No. 22966, 2009-Ohio-6270, at ¶ 18.

{¶ 28} In support of his argument, Jali has relied on *Swann* and *State v. Howard*, 7 Ohio Misc.2d 45, 455 N.E.2d 29 (M.C.1983). In *Howard*, the court noted that "entrapment occurs when the whole criminal idea and purpose originates with the police, not the defendant." *Id*. at 45. The court also stated that "in a soliciting case, the crime *is* in the asking." (Emphasis sic.) *Id*. *Accord Swann* at 90.

{¶ 29} In *West*, we disagreed with *Swann's* reasoning that "to prove a violation of R.C. 2907.24 the State has the burden to demonstrate that a person accused of soliciting prostitution not only offered to engage in sexual activity for hire, but initiated an offer that was complete in those terms." *West* at ¶ 21. We commented that:

> The conduct that R.C. 2907.24 prohibits is the offer. Whether it is done in the form of an initial offer, a counter offer, or in response to an open inquiry, is immaterial. Furthermore, whether the criminal idea or purpose instead originated with the other person implicates the affirmative defense of entrapment and the related issue of the accused's predisposition, which are evidentiary issues to be resolved after proof of solicitation is offered. [The defendant's] request to be paid $20 demonstrates that her offer to engage in sexual activity was to do so "for hire."

*Id.* at ¶ 22.

**{¶ 30}** In the case before us, construing the evidence in favor of the State, Jali made the initial contact with Hammond. Jali also asked Hammond to come sit on the bench, and asked her if she had a boyfriend, which is a common approach in solicitation. When Hammond said no, Jali asked if she wanted to "go with him." After Hammond asked what he meant, Jali smiled and said, "You know what I want." He then clarified that he wanted sex. When Hammond asked if 20 dollars was ok, Jali twice confirmed that 20 was not too much. Although Hammond "named the specific cost" for sex, it is clear that Jali was aware that "monetary payment was expected (for hire)." *Short*, 2d Dist. Montgomery No. 27192, 2017-Ohio-7200, at ¶ 36. Accordingly, there was sufficient evidence to sustain a conviction.

**{¶ 31}** With respect to the manifest weight argument, we note that Jali presented a story at trial different from that of Officer Hammond. Jali testified and claimed he was not fluent in English and did not understand what Hammond meant when she mentioned "twenty." He did admit that he asked for sex. Notably, the jury was entitled to reject Jali's testimony.

**{¶ 32}** We have said on many occasions that " '[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.' " *Winbush*, 2017-Ohio-696, 85 N.E.3d 501, at ¶ 59,

quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 33} Here, the jury chose not to believe Jali, and we defer to the jury, which had the best opportunity to observe the witnesses. We also note that the State presented testimony from a police officer who came to Jali's home in mid-July 2018 (which was shortly after the prostitution complaint was filed). Jali had contacted the police about neighborhood kids throwing sauce and tomatoes all over his vehicle. When the officer spoke with Jali, Jali did not ask for an interpreter and spoke with the officer in English. The officer testified that while Jali had an accent and his English was a little bit broken, Jali also could understand what the officer was conveying and responded appropriately to the questions he was asked.

{¶ 34} In light of the above discussion, the conviction was not against the manifest weight of the evidence. As noted, it was also supported by sufficient evidence. The First Assignment of Error, therefore, is overruled.

### III. Alleged Error in Failing to Admit Evidence

{¶ 35} Jali's Second Assignment of Error states as follows:

The Trial Court Erred in Not Allowing Defendant's Exhibit A into Evidence.

{¶ 36} Under this assignment of error, Jali contends that the trial court erred in failing to admit Defendant's Exhibit A, which is a piece of notebook paper on which Jali wrote down words in Arabic and English.

{¶ 37} Jali testified that when he calls the police, sometimes he writes words out

in Arabic and translates what he is going to say into English. In this vein, Jali indicated that he once had to report that his papers were stolen. He identified Exhibit A as a piece of paper showing that when he lost his papers, he wrote down exactly what he wanted to say and translated it into English.

{¶ 38} After testimony had ended, Jali's counsel asked to admit Exhibit A, but the trial court rejected the request. During discussion of this exhibit, the State argued that the document was self-serving hearsay, while the defense contended that it was relevant to show Jali's actual language abilities and that he was not lying about his English skills. Tr. at p. 114. The trial court concluded that there was no need for the exhibit, because Jali had testified about his process. *Id.* at p. 116.

{¶ 39} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). We therefore review the trial court's decision for abuse of discretion. An abuse of discretion indicates a trial court attitude that is arbitrary, unconscionable, or unreasonable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). We have often stressed that "[m]ost abuses of discretion 'will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.' " *Kossoudji v. Stamps*, 2016-Ohio-7693, 65 N.E.3d 815, ¶ 22, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a

contrary result." *AAAA Ents.* at 161.

{¶ 40} Evid.R. 402 provides that "[a]ll relevant evidence is admissible," and irrelevant evidence is not admissible. Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under this definition, Exhibit A, which we have reviewed, is only marginally relevant, as it is simply an undated sheet of paper on which Jali wrote a few phrases in English and Arabic, relating to a call he made to the police about losing his papers. According to Jali, this call was made a few weeks after he was arrested for solicitation. It did not relate to the solicitation, nor did it relate to the incident that a police officer testified about during rebuttal; that incident involved neighborhood children throwing tomatoes and tomato sauce on Jali's car.

{¶ 41} Even if we felt the exhibit were of more than marginal relevance, Evid.R. 403(B) gives trial courts discretion to exclude relevant evidence, "if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." " 'Cumulative evidence' is additional evidence of the same kind to the same point." *Kroger v. Ryan*, 83 Ohio St. 299, 94 N.E. 428 (1911), syllabus.

{¶ 42} Here, Jali had already testified about the fact that he wrote down English and Arabic words when he called the police about losing his papers. An undated exhibit showing that he wrote words on a piece of paper was additional evidence about the same point and added nothing to his testimony. Accordingly, the trial court's decision was not arbitrary or irrational, nor was it based on unsound reasoning.

{¶ 43} Accordingly, the Second Assignment of Error is overruled.

## III.   Conclusion

{¶ 44} All of Jali's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J., concurs.

DONOVAN, J., dissents:

{¶ 45} I dissent.   In my view, *Howard*, 7 Ohio Misc.2d 45, 455 N.E.2d 29, and *Swann*, 142 Ohio App.3d 88, 753 N.E.2d 984, dictate a reversal of Jali's conviction.   Jali did not solicit sex for hire.   The decoy officer introduced the subject of monetary compensation for sex into the conversation.   Jali did not offer money in return for sexual performance.   The crime of which Jali was convicted does not prohibit acceptance, only entreaty, of sex for hire, as noted in *Swann*.   *Swann* at 986.   The majority cites *Short*, 2d Dist. Montgomery No. 27192, 2017-Ohio-7200, but it is distinguishable as it relied in part on a Backpage ad which identified "sex for hire".   I would reverse and vacate the conviction.

Copies sent to:

Amy B. Musto
Adam James Stout
Hon. Carl Sims Henderson