[Cite as *State v. Santana*, 2022-Ohio-4118.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29348 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-3574 |
| | : | |
| VICTOR SANTANA | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 18th day of November, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

CHARLES W. SLICER, III, Atty. Reg. No. 0059927, 426 Patterson Road, Dayton, Ohio 45419
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Victor Santana appeals from his convictions for murder and felonious assault. Santana contends that the trial court improperly excluded evidence of past trespasses on his property, which was relevant to his state of mind at the time he shot and killed two trespassers in his detached garage. Santana also argues that the trial court should have excluded from evidence two recordings of his interviews with police due to a lack of clarity in his responses to the officers' questions. Further, Santana contends that his trial counsel provided ineffective assistance by failing to object to the admission of those recordings. Finally, Santana argues his convictions were against the manifest weight of the evidence.

{¶ 2} For the reasons that follow, we affirm Santana's convictions.

I.      Facts and Course of the Proceedings

{¶ 3} On November 21, 2019, a Montgomery County grand jury indicted Santana on four counts of murder (proximate result), first-degree felonies in violation of R.C. 2903.02(B); two counts of felonious assault (serious physical harm), second-degree felonies in violation of R.C. 2903.11(A)(1); three counts of felonious assault (deadly weapon), second-degree felonies in violation of R.C. 2903.11(A)(2); and one count of attempt to commit murder, a first-degree felony in violation of R.C. 2923.02(A). All counts contained firearm specifications. All of the counts relate to the night of August 28, 2019, when Santana shot and killed Devin Henderson and Javier Harrison, who were sitting in a car in the detached garage on Santana's property with their friend, Ja'shin Gibson.

{¶ 4} Santana filed a motion to suppress the statements he made during his two interviews with the police. He also filed a motion in limine requesting that the trial court allow his counsel to elicit testimony and evidence that trespassers had previously caused damage to his house and truck. The trial court overruled both motions. On November 29, 2021, Santana moved to dismiss the attempt to commit murder count of the indictment. Ultimately, this count was dismissed, leaving nine counts to be tried to a jury.

{¶ 5} The jury trial was held from November 30 to December 2, 2021. Several witnesses testified at the trial. Lee Lehman, the Chief Deputy Coroner for Montgomery County, testified first for the State. He had performed autopsies on Devin Henderson and Javier Harrison. According to Lehman, Henderson was shot multiple times in his back, and the bullets did not exit his body. The gunshot wounds caused Henderson's death, and there were no other contributing causes. Trial Tr., p. 184-193, 198-199. Both bullets entered Henderson's back in a downward path. *Id.* at 194. Henderson's toxicology report was positive for the presence of marijuana. *Id.* at 198. Lehman testified that Javier Harrison had a gunshot wound to the left side of his back; the bullet went through his heart and left lung. He also had a gunshot wound to his left forearm. *Id.* at 204-205, 207-209. Harrison died as a result of multiple gunshot wounds. *Id.* at 214. Harrison's toxicology report also showed the presence of marijuana. *Id.* at 213. Lehman did not find any weapons in the possession of Henderson or Harrison. *Id.* at 214.

{¶ 6} Dayton Police Officer Jeff Downing testified next for the State. He had been dispatched to Santana's house at 848 Conners Street around 10:00 p.m. on August 28,

2019, due to a reported shooting. *Id.* at 221-223. Downing took several photographs of the crime scene. Officer Downing did not find any weapons around either Harrison or Henderson. *Id.* at 232, 236. He noted that Santana's yard was well maintained, but he did notice some plywood and plastic over some windows of the house. *Id.* at 228, 241. It was very dark around the garage and there was no electricity in the garage. *Id.* at 242. Officer Downing agreed that there were many abandoned houses in Santana's neighborhood. *Id.* at 243.

{¶ 7} Ja'shin Gibson testified for the State. Gibson, who was 19 years old on the night of August 28, 2019, had known Harrison since they were 12 or 13 years old, and he had met Henderson at the Boys and Girls Club when he was five or six years old. *Id.* at 252-253. The three of them ran around together all the time, chilling, smoking, and laughing. *Id.* at 253. They regularly smoked marijuana together. *Id.* at 253-254. The three men met at Gibson's place that night and were looking for a place to smoke. They walked by Santana's house and thought it was abandoned due to the boarded windows and run-down cars in the garage. *Id.* at 254-255. None of them had any weapons, and Harrison brought the marijuana. *Id.* at 257. It was very dark on the property, and Gibson did not notice any lights on in the house. *Id.* at 257-259. The three men entered the garage and got into the Lincoln Continental in the garage. Gibson sat in the front on the passenger's side, Henderson sat in the front on the driver's side, and Harrison sat in the back on the driver's side. *Id.* at 263.

{¶ 8} The three men had been in the car only for approximately five to ten minutes when Gibson lit his lighter to give Harrison some light to roll up a marijuana blunt. As

Gibson passed the lighter to Harrison to light up the blunt, he saw the back door of the car open, saw flashes, and heard gunshots. Harrison screamed that he had been shot. The person with the gun then opened Henderson's door and pointed the gun inside. Henderson tried to push the gun up and exit the car. Henderson attempted to run to the front of the car after getting out but was shot in the back. *Id.* at 264-271. Gibson was able to get out of the car and hide underneath it. Gibson stayed underneath the car until the shooter exited the garage. After Gibson got out from underneath the car, he was able to observe the shooter enter the house on the property. Gibson then left the property and ran away screaming for help. *Id.* at 271-273.

{¶ 9} Gibson returned to the scene of the shooting after he tried to tell people what had happened. He spoke to a detective and initially lied about what had happened. *Id.* at 273, 290. But he then told the truth. *Id.* at 278. On cross-examination, Gibson reiterated that he had not heard the shooter coming before he had started shooting. He admitted that he had not been able to see the shooter during the gunfire, but he had seen the shooter go into the house afterward. Further, Gibson testified that he and his two friends had never been on that property before and that, if the cars in the garage had been locked, they would have left the property without smoking there. According to Gibson, he and his friends had not intended to damage or take anything that night. *Id.* at 279-280, 286, 299.

{¶ 10} Sergeant Clinton Evans of the Dayton Police Department also testified for the State. He was dispatched to the crime scene on the night in question in response to the homeowner's call about a shooting. *Id.* at 304-305. When Sergeant Evans arrived,

there was a firearm on the porch of the residence and there were two individuals in the garage. He testified that there were no signs of life from the individuals in the garage and no evidence of any weapons near them. *Id.* at 310-311. As Sergeant Evans approached the garage in the dark, he had his weapon drawn. *Id.* at 312-314.

{¶ 11} Detective Stephen Lloyd of the Dayton Police Department testified next for the State. He was dispatched to the crime scene at 9:20 p.m. based on a report that a male had shot two other males in his garage. *Id.* at 317-319. When Detective Lloyd arrived, he noticed that it was very dark on the property near the detached garage. Two of the officers on the scene pulled an individual from the garage to render medical aid. *Id.* at 322-323. The officers had approached the garage with their guns drawn for their own safety. Ultimately, there were no signs of life from the two individuals in the garage and no sign of weapons. *Id.* at 324-325. Detective Lloyd noticed a male near the property who was crying, pacing, and very agitated; this male was Gibson. Detective Lloyd eventually spoke with Gibson about what had happened. Gibson initially stated that he and his friends had been in the alley when Santana started shooting at them, but he then changed his story and told Lloyd that he and his friends had gone into the garage to smoke marijuana and then Santana had started shooting at them. *Id.* at 331-335, 340.

{¶ 12} Detective Alexander Dole also testified for the State. He was part of the special victims' unit of the Dayton Police Department. Detective Dole had been called to the crime scene on the night of August 28, 2019. When he arrived, the garage door was open, and officers were pulling a male out of the garage. Detective Dole observed a male at the front of the car bleeding and likely deceased. *Id.* at 347-349. He did not

observe any weapons around either of the two males. *Id.* at 351. Detective Dole agreed on cross-examination that he would not have been able to observe any weapons without the use of a flashlight. *Id.* at 352.

{¶ 13} Officer Jamie Luckoski of the Dayton Police Department testified that he had been dispatched to the crime scene and had approached the garage with other officers. *Id.* at 359-360. Officer Luckoski had pulled Harrison out of the garage and had noted a faint pulse, but both Harrison and Henderson ultimately were pronounced dead at the scene. *Id.* at 365-367. On cross-examination, Officer Luckoski noted that flashlights had been used when approaching Henderson and Harrison to help determine if there were any weapons or any movements. *Id.* at 368-369.

{¶ 14} Officer Stephen Cline of the Dayton Police Department also testified that he had recovered a revolver at the scene, discovering one live round and five spent casings in the gun. *Id.* at 376.

{¶ 15} Craig Stiver, a coroner investigator for the Montgomery County Coroner's Office, testified that he had examined the Lincoln Continental from the garage, noting that it had been very dusty and had no battery. Also, there had been blood on the front bumper and in the back seat. Stiver also found a marijuana cigarette and a spent bullet. *Id.* at 386, 388-394. While Stiver stated that he did not find any weapons in the car, he testified on cross-examination that he found a wrench, screwdriver, and a PVC pipe under the driver's seat. *Id.* at 396-397.

{¶ 16} Detective Melissa Schloss of the Dayton Police Department was also dispatched to the crime scene on the night in question. She testified that there had been

no lighting in the garage area and that it was approximately 42 feet from the back of the house to the garage. *Id.* at 410-411. She spoke with Gibson on the night of the shootings. Officer Schloss testified that Gibson's testimony at trial was consistent with what he told her on the night of the shootings. *Id.* at 412. She interviewed Santana twice after the shootings, once on the night of the shooting and once about three months after the shooting. On cross-examination, Detective Schloss testified that Santana had told her that he feared the males coming into his house on the night of the shooting. *Id.* at 435.

{¶ 17} Elizabeth Ramirez, Santana's niece, testified that Santana was a working man who was handy and had a routine of going to work, cutting his grass, and researching information on his computer. *Id.* at 456-457. Elizabeth said Santana was like a father to her. *Id.* at 457. She had never seen him with a gun and considered him to be a very peaceful man. *Id.* at 458-459. According to Elizabeth, Santana sometimes volunteered at a homeless shelter. *Id.* at 459.

{¶ 18} Leticia Ramirez, Santana's sister, also testified for the defense. *Id.* at 465-475. She noted that Santana had worked all of his life. *Id.* at 468. She and Santana visited each other often and were very close. Leticia described her brother as a kind, loving, peaceful, quiet man. *Id.* at 469, 471. Santana had told her that he purchased a gun. *Id.* at 470. Leticia testified that her brother had a routine of going to work, coming home, learning about new things, and going for walks. *Id.* at 474.

{¶ 19} The State also played for the jury portions of the videotaped recordings from Santana's two interviews with the police. The jury had the opportunity to see and hear

Santana explaining what had happened on the night in question and why he had shot Henderson and Harrison.

{¶ 20} The State read to the jury the stipulations of the parties. The stipulations provided, in part, that the revolver recovered from the front porch of 848 Conners Street was Santana's firearm, that an expert would testify that the five fired cartridges found at the scene were identified as having been fired from Santana's firearm, and that the DNA profiles obtained from the rear driver's-side area of the car matched Javier Harrison. *Id.* at 399-400.

{¶ 21} Following the testimony, the jury returned guilty verdicts on the first eight counts, which involved allegations of murder and felonious assault against Henderson and Harrison. But the jury returned a not guilty verdict on the ninth count, a felonious assault count related to Ja'shin Gibson. The trial court merged counts 1, 2, 5, and 6 relating to Devin Henderson and counts 3, 4, 7, and 8 relating to Javier Harrison. The court then imposed concurrent sentences of 15 years to life on counts 1 and 3, and it ordered that the three-year firearm specifications attached to counts 1 and 3 be served consecutively to each other and to the 15 years to life, for a total sentence of 21 years to life. Santana filed a timely appeal from his convictions.

II. The Trial Court Did Not Abuse Its Discretion By Excluding Evidence of Past Trespasses

{¶ 22} Santana's first assignment of error states:

THE TRIAL COURT ERRED IN PREVENTING APPELLANT FROM

INTRODUCING RELEVANT EVIDENCE IN HIS DEFENSE, THEREBY VIOLATING HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS, A FAIR TRIAL, THE RIGHT TO A FULL AND FAIR DEFENSE, AND FUNDAMENTAL FAIRNESS.

{¶ 23} Santana contends that he purchased a gun for protection of himself and his property based on prior incidents involving damage to his property and house. He points out that he had previously complained to police about damage to the main door of his residence and the window to his truck and about individuals throwing rocks at his property. Appellant's Brief, p. 12. According to Santana, "Ohio has a subjective test to determine whether or not a defendant acted in self-defense," and "the defendant's state of mind is crucial." *Id.* at p. 13. Therefore, Santana's "situation should have been evaluated in accordance with his actual interpretation of the danger these individuals posed to him based on his unique circumstances," which included prior trespasses. *Id.*

{¶ 24} The State disagrees and notes that there was no evidence to tie the victims in this particular case to any prior incident involving Santana or his property. Appellee's Brief, p. 8. Further, the State notes that when kids threw rocks at Santana's house and vehicle in the past, Santana yelled at them and they ran away. According to the State, there was no evidence presented that any of the prior events involved threats to Santana that would have justified the force Santana exerted on the night of August 28, 2019.

{¶ 25} The admission or exclusion of relevant evidence is within the sound discretion of the trial court, and we review that decision for an abuse of discretion. *State v. Jali*, 2d Dist. Montgomery No. 28294, 2020-Ohio-208, ¶ 39. The term "abuse of

discretion" indicates an attitude that is arbitrary, unconscionable, or unreasonable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). It has been previously noted that most abuses of discretion "will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 26} In its ruling excluding the evidence of prior trespasses onto Santana's property, the trial court noted that the prior instances of trespassing onto or throwing rocks at Santana's property had been too remote in time to the night of the incident in question. Further, the trial court stated that there was no evidence directly connecting any of the prior incidents to the three males involved in the incident on August 28, 2019. Indeed, Santana's trial counsel conceded that there was no evidence of such a connection. Trial Tr., p. 424-425.

{¶ 27} Notably, the trial court allowed the admission of evidence from Santana that he had seen footprints by the door to his house. Also, Gibson testified that it was common to hear gunshots in the neighborhood where Santana lived. *Id.* at 285. Santana's counsel specifically mentioned both of these facts in his closing argument. *Id.* at 502, 504, 513. Further, Santana's counsel noted in his closing argument that Gibson had testified that trespassing was common in that neighborhood. In addition, Santana's counsel reminded the jury that Santana had stated in his police interview that he often heard gunshots in his neighborhood. *Id.* at 502, 505. In short, Santana was allowed to

introduce other evidence to the jury to paint a picture that Santana had had a reason to be fearful when he saw the trespassers.

{¶ 28} Based on our review of the evidence that was permitted and the evidence that was excluded, we do not believe the trial court abused its discretion in refusing to allow into evidence Santana's proffered statements regarding past trespasses on his property that were remote in time to the night of August 28, 2019, and had no connection to Henderson, Harrison, and Gibson.

{¶ 29} Further, we believe that the proffered evidence regarding prior incidents of trespass onto Santana's property, even if admitted into evidence, could not have overcome the inherent deficiencies in Santana's claim of self-defense.   To establish self-defense, the evidence must show (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.   *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002), citing *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus.   If the evidence shows beyond a reasonable doubt that at least one of these three elements is missing, a defendant cannot establish self-defense.

{¶ 30} "The 'not at fault' requirement also means that the defendant must not have been the first aggressor in the incident."   *State v. Turner*, 171 Ohio App.3d 82, 2007-Ohio-1346, 869 N.E.2d 708, ¶ 23 (2d Dist.), citing *Robbins*.   "An individual who is the first aggressor in an incident is 'at fault' for purposes of self-defense."   *State v. Williams*,

9th Dist. Summit No. 29444, 2020-Ohio-3269, ¶ 9, citing *Turner* at ¶ 23. Further, "there is an objective and a subjective aspect involved in determining whether a defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm: an individual's belief that he or she was in imminent danger must be objectively reasonable, and the individual must have an honest subjective belief to that effect." (Citations omitted.) *Id.* at ¶ 11.

{¶ 31} In *State v. Perez*, 7th Dist. Mahoning No. 09 MA 30, 2010-Ohio-3168, the court analyzed the interplay between the first two elements of a self-defense claim and evidence of past trespasses. In *Perez*, the defendant was responsible for checking on his sister's house while she was out of town. At that time, defendant lived at his mother's house, which was located near his sister's house. The defendant knew that a cousin was staying at his sister's house, along with a 4-year-old child. The defendant saw an individual park a car outside his sister's house, go into the house, and then come back out of the house and sit in the parked car. The defendant walked over to the car with a baseball bat and smashed the driver's side window of the car. *Id.* at ¶ 1. According to the defendant, he was acting either in defense of another or defense of property. *Id.* at ¶ 3. In particular, the defendant argued that he had had a legitimate reason to be afraid of the individual in the parked car because his mother's house had been previously robbed. *Id.* at ¶ 17.

{¶ 32} The Seventh District rejected the defendant's arguments. According to the court:

> In determining whether there are reasonable grounds for believing

there was an imminent threat of bodily harm, the court can consider whether the defendant received prior threats or encountered prior trespassers. *State v. Fields* (1992), 84 Ohio App.3d 423, 428, 616 N.E.2d 1185.

* * *

Appellant believes that he had a legitimate reason to be afraid of J.R. because his mother's house had been previously robbed. It is true that the defendant's state of mind is an important factor in establishing self-defense. *State v. Moore*, 3d Dist. Nos. 1-06-89, 1-06-96, 2007-Ohio-3600, ¶ 59. There must be both reasonable and objective grounds to believe that harm is imminent, and there must be an honest and subjective belief that harm is imminent. *State v. Thomas* (1997), 77 Ohio St.3d 323, 330, 673 N.E.2d 1339. It is also true that, in determining whether there are reasonable grounds for believing there was an imminent threat of great bodily harm, the court may consider whether the defendant received prior threats or encountered prior trespassers. *State v. Fields* (1992), 84 Ohio App.3d 423, 428, 616 N.E.2d 1185. Nevertheless, the defense of self-defense does not permit the alleged victim to become the aggressor once the affray has ended, or before an affray has even taken place. "The 'not at fault' requirement * * * means that the defendant must not have been the first aggressor in the incident." * * *

Appellant was obviously at fault in creating the affray because J.R. was sitting in his car preparing to leave when Appellant attacked him. There

is no evidence that J.R., a 16-year old boy, presented any type of threat to anyone when he was assaulted.

*Perez* at ¶ 15-18.

{¶ 33} Like the defendant in *Perez*, Santana was the first aggressor and at fault in creating the affray. Santana left his home searching for the trespassers. When he entered the detached garage that was 42 feet from his house, he was not confronted or cornered by the trespassers. Rather, he saw a light flicker in the inside of a car in the detached garage. Instead of returning to his home from the detached garage, he walked toward the car, opened the back door, and shot Harrison. He then proceeded to shoot Henderson. Under these facts, no reasonable jury could have found that Santana shot Harrison and Henderson in self-defense. Nothing in the evidence proffered to the trial court relating to past occurrences of trespass or damage to his property could have altered the fact that Santana was at fault for the affray as the aggressor, which precluded a finding of self-defense as a matter of law.

{¶ 34} Santana's first assignment of error is overruled.


III.    The Trial Court Did Not Abuse Its Discretion By Admitting Into Evidence The Two Police Interviews

{¶ 35} Santana's second assignment of error states:

APPELLANT WAS DEPRIVED OF THE RIGHT TO A FAIR TRIAL AND FUNDAMENTAL FAIRNESS THROUGH THE ADMISSION OF TWO TAPED INTERVIEWS.

{¶ 36} Santana contends that the trial court improperly admitted into evidence taped recordings of two interviews of Santana conducted by police. According to Santana:

[L]arge portions of these recordings were entirely incomprehensible due to the quality of the recordings, mumbling, Appellant's poor English. Although an interpreter was present for the second interview, he appeared to be allowing Appellant to struggle through the interview without interpreting portions of it. Further, the interpreter was mumbling and was turned away from the camera. The bulk of the recording was unintelligible.

Appellant's Brief, p. 15. Santana argues that the "[e]xclusion of these recordings was mandatory under the Ohio Rules of Evidence, as their probative value was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." *Id.* at 17.

{¶ 37} The State responds that, although Santana speaks in broken English, "he could both speak understandable English and he understood English and the questions that were being asked." Appellee's Brief, p. 15. According to the State, "Santana described what happened, and although his English is not perfect, he was understandable." *Id.* Further, the State points out that the trial court reviewed the two interviews when ruling upon Santana's motion to suppress, and it noted that one could determine what Santana was saying in English upon careful listening. *Id.* at 16. Also, at oral argument, counsel for the State pointed out that any argument regarding difficulty in understanding or hearing portions of the two taped interviews would go to the weight

to be given the evidence, rather than its admissibility.

{¶ 38} As noted above, the admission or exclusion of relevant evidence is within the sound discretion of the trial court, and we review that decision for an abuse of discretion. *State v. Jali*, 2d Dist. Montgomery No. 28294, 2020-Ohio-208, ¶ 39. Normally, potential prejudice is an insufficient basis on which to exclude relevant evidence. Rather, a trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of *unfair* prejudice. Evid.R. 403. "Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to the litigant's case would be excludable under Rule 403. Emphasis must be placed on the word 'unfair.' Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." (Citation omitted.) *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001). For example, "if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect." *Id.*

{¶ 39} We have reviewed the recordings of Santana's two interviews with police. Although there are instances in which Santana's statements are more difficult to understand than others, we do not agree with Santana's assertion that the video recordings are largely unintelligible. Rather, a close listener can discern what Santana was saying. We note that Santana's trial counsel quoted rather extensively from Santana's recorded interviews during his closing argument at trial. Trial Tr., p. 503-505.

Further, Santana has failed to explain on appeal what particular portions of the recordings could cause unfair prejudice by the jury's viewing them. On the record before us, we cannot conclude that the trial court abused its discretion by allowing the admission of the the recordings of Santana's interviews with the police.

{¶ 40} Santana also contends in this assignment of error that one of the State's comments in its closing argument may have improperly implied that Santana's decision not to testify should be held against him. Appellant's Brief, p. 16-17. He cites page 490 of the trial transcript in support of his contention. In that particular portion of its closing argument, the State explained:

Now, the evidence that you heard from Ja'shin and this Defendant is that these three individuals were seated in his car in the pitch darkness, and that the Defendant saw a light come on in the car. And you heard Ja'shin explain what that was. They lit a lighter. They were going to light up a blunt and get high.

And they were sitting in the car. And the next Ja'shin knows is the door opens, and the Defendant starts shooting. That's Ja'shin. *So we have two people that were there that can come in here and actually take that stand and tell you what happened, okay? One is Ja'shin, and that's what he told you. The other one is this Defendant.*

And what this Defendant told you was he heard voices. He got up out of bed, and he went and got his gun. That was the first thing he did. And he didn't lock the doors. And he didn't call 911. He went out to the

front and he looked around.   And he didn't see anybody.   And he tells you

that he's scared, okay?

(Emphasis added.)   Trial Tr., p. 489-490.   The State then went on to discuss other

statements Santana made in his interviews with the police.

{¶ 41} While we acknowledge that the State toed the line when it brought up the fact that Santana could have taken the stand at trial, we do not agree with Santana that the State crossed the line into improper interference with Santana's right to a fair trial. Rather, the State immediately began to explain what Santana's story to police was, taken directly from interviews with the police that previously had been played for the jury.   In other words, the State noted that two people were able to explain what had happened that night, Ja'shin and Santana.   Then the State recapped what each said about the night in question.   Therefore, we conclude that the State's solitary reference to Santana's opportunity to "take that stand," when considered in context, did not violate Santana's right to a fair trial.

{¶ 42} Santana's second assignment of error is overruled.


IV.     Santana Was Not Denied His Right to Effective Assistance of Counsel

{¶ 43} Santana's third assignment of error states:

APPELLANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT

TO EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 44} Santana contends that his trial counsel "was ineffective for failing to object to the playing of the two largely unintelligible and inaudible recorded interviews for the

jury." Appellant's Brief, p. 18.

{¶ 45} To prevail on his ineffective assistance of counsel claim, Santana must prove that his attorney was ineffective under the standard test from *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To do so, he must prove that his counsel's performance was deficient and that he was prejudiced by that performance. *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 560, ¶ 10. "Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Id.* The failure to meet either prong is fatal to an ineffective assistance of counsel claim. *Strickland* at 697.

{¶ 46} As we explained in our resolution of Santana's second assignment of error, the trial court did not abuse its discretion by admitting into evidence the taped recordings of Santana's two interviews with the police. As such, we cannot conclude that the failure of Santana's trial counsel to object to the admission of this evidence constituted an error, let alone that there is a reasonable probability that, but for that alleged error, the result of the trial proceedings would have been different.

{¶ 47} The third assignment of error is overruled.

V.     Santana's Convictions Were Not Against The Manifest Weight of The Evidence

{¶ 48} Santana's fourth assignment of error states:

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST

WEIGHT OF THE EVIDENCE.

**{¶ 49}** Santana contends that his convictions were against the manifest weight of the evidence and "that the evidence simply does not support the felonious assault charges pertaining to Ja'shin Gibson, as Ja'shin could not see well enough in the garage to know what was happening, and there was insufficient evidence to support the contention that Appellant had attempted to shoot at him during this incident." Appellant's Brief, p. 23.

**{¶ 50}** Before addressing whether Santana's convictions were against the manifest weight of the evidence, we must point out that Santana was found not guilty of the one count of felonious assault relating to Ja'shin Gibson. Therefore, in this assignment of error, we will only address the counts on which Santana was found guilty.

**{¶ 51}** "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). However, "[w]here an appellate court determines that a conviction is not against the manifest weight of the evidence, the conviction is necessarily based on legally sufficient evidence." (Citations omitted.) *State v. McLoughlin*, 2d Dist. Champaign No. 2017-CA-22, 2018-Ohio-2426, ¶ 8.

**{¶ 52}** "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all

reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice" such that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Because the trier of fact sees and hears the witnesses at trial, we must defer to the fact finder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 53} We recognize that, in other assignments of error, Santana challenges the trial court's admission of the video from Santana's two police interviews. However, when reviewing claims based on the sufficiency or manifest weight of the evidence, we are required to consider all of the evidence admitted at trial, regardless of whether it was admitted erroneously. *See State v. Fleming*, 2d Dist. Clark No. 2021-CA-40, 2022-Ohio-1876, ¶ 27, citing, *e.g.*, *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284. Accordingly, and because we have found that the videos were properly admitted, we must consider the two interviews as part of our analysis.

{¶ 54} Santana was found guilty of several counts of murder and felonious assault. Pursuant to R.C. 2903.02(B), a person is guilty of murder if he causes "the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation

of section 2903.03 or 2903.04 of the Revised Code." Pursuant to R.C. 2903.11(A)(1), a person is guilty of felonious assault if he knowingly causes serious physical harm to another. Further, pursuant to R.C. 2903.11(A)(2), a person is guilty of felonious assault if he knowingly causes serious physical harm to another by means of a deadly weapon or dangerous ordnance.

{¶ 55} At trial, it was uncontested that Santana left his home and went searching for trespassers that he had seen when looking out the window of his home. He eventually found them in his detached garage, which was located about 42 feet from his house. When he entered the garage, he was not confronted or cornered by the trespassers. Rather, they were sitting in a car with the doors closed. Rather than returning to his home, Santana continued to the car, opened the back door, and started shooting. Harrison and Henderson died as a direct result of the gunshot wounds from Santana's gun. The overwhelming evidence of record, including the statements made by Santana during his police interviews, the testimony of Ja'shin Gibson, who was the only other surviving witness, the testimony of the police officers who were called to the crime scene and the officer who interviewed Gibson and Santana, and the stipulations at trial, supported the jury's guilty verdicts on the felonious assault and murder counts Further, as we explained above, Santana's claim of self-defense failed as a matter of law because he was the first aggressor.

{¶ 56} Upon the record before us, we cannot conclude that Santana's convictions were against the manifest weight of the evidence. Therefore, the fourth assignment of error is overruled.

VI.     Conclusion

{¶ 57} Having overruled all of Santana's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .


TUCKER, P.J. and EPLEY, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Charles W. Slicer, III
Hon. Timothy N. O'Connell