OPINION
{¶ 1} Stewart W. Lawson was convicted of misconduct at an emergency after a jury trial in the Montgomery County Area One Court. Lawson was sentenced to serve thirty days in jail and to pay a $250 fine, plus court costs, with all of the jail time and $200 suspended on the conditions that he have no violations of the law for one year and he receive treatment at *Page 2 
DayMont. The trial court stayed the sentence pending appeal. On appeal, Lawson claims that the trial court erred in failing to instruct the jury on the defenses of duress and necessity. For the following reasons, Lawson's conviction will be affirmed.
 I {¶ 2} Stewart Lawson was the pastor of Eternal Crown Church, located at 1057 Johnsville Farmersville Road in Jackson Township. In April 2006, Lawson had a residence at the church, which he was temporarily sharing with his daughter, Tamara, and her three children.
 {¶ 3} Early in the morning of April 25, 2006, Lawson got up and made breakfast and coffee for his family. He offered to drive Tamara's oldest child to school, and his daughter accepted the offer. After taking his grandson to school, Lawson met a long-time friend, Michael Isaacs. Lawson planned to help Isaacs repair a trailer that he (Isaacs) had just purchased. The two men drove in Isaacs' van to Lowe's on S.R. 741 to get supplies for the repairs. In the meantime, Tamara got her two younger children to the bus stop and then prepared to strip and rewax the floors at the church.
 {¶ 4} Between 9:00 a.m. and 9:15 a.m., while Isaacs and Lawson were in the Lowe's parking lot after completing their purchases, Lawson received the first of two telephone calls from Tamara on his cell phone. Tamara told him that she saw smoke in the garage and coming out from under the eaves of the church . Lawson instructed her to hang up and call 911. Tamara said she would call him back. Tamara called back five or six minutes later and told Lawson that she had called 911 and told the authorities that the church was on fire. At that point, Tamara's phone went dead and the call was disconnected. (Tamara explained at trial that her cell phone battery was low.) Lawson asked Isaacs to get him to the church. Isaacs described *Page 3 
Lawson's demeanor in the vehicle as becoming hysterical, generally unresponsive, and a little delusional. Lawson was greatly concerned for his daughter's safety. He believed that she might go back into the building to retrieve her children's belongings.
 {¶ 5} Isaacs stopped the van near two fire trucks by the church driveway on Johnsville Brooksville Road. By that time, numerous fire departments had responded to the 911 call, including units from New Lebanon, Farmersville, Germantown, and Jackson Township North. Because there were no fire hydrants in the area, water supplies were brought in with pumping trucks from New Lebanon and Farmersville. Germantown provided an aerial truck. Fire Chief Marcus of the Jackson Township North department coordinated the operations from near the church. Farmersville Fire Chief Tom Wallace oversaw the water operations. Two officers from the Jackson Township Police Department — Detective Eli Winkler and Sergeant John Schade-had also arrived at the scene in marked cruisers to assist with traffic and crowd control.
 {¶ 6} Before the van was fully parked, Lawson exited the van, saying "Tamara's up there" and "I gotta get to Tamara." Lawson approached a firefighter to ask about his daughter. Wallace testified for the state that he recognized Lawson as the pastor and spoke with him near a water tank. Wallace stated that he told Lawson that his daughter was fine, that he had talked with her, and that she was standing by Chief Marcus's pickup truck. Wallace testified that he told Lawson his daughter's location no less than three times, because Lawson was concerned about his daughter. Wallace also told Lawson that he needed information from him concerning the structure and the contents of the church. Wallace was trying to learn whether there were any chemicals in the garage or other items that might pose a danger to the firefighters. Wallace stated that Lawson "didn't really say too much to me. He was really concerned." Lawson did *Page 4 
not respond about the contents of the church. He turned away from Wallace and said, "I've got to get my guns." When Lawson walked away, Wallace asked Schade and Winkler — who were approximately fifteen and thirty feet from Wallace, respectively — to stop Lawson.
 {¶ 7} According to Winkler and Schade's testimony for the state, Lawson first walked past Schade, who told him twice to stop. Lawson continued walking and went past Winkler, who also twice told him to stop. After Winkler called to Lawson a second time, Lawson turned around, looked him in the eye, and then started running toward the church. Winkler caught up with Lawson and placed him a bear hug. According to Winkler, Lawson stated that he had to check on his daughter and get his guns. Winkler responded that he needed to talk to him. Lawson raised his arms to release himself. Winkler grabbed him a second time and pulled him to the ground. Winkler held Lawson's right arm behind his back. Schade ran up, held Lawson's head down, and told him to "settle down." Lawson continued to wrestle on the ground, and he called the officers "communist pigs." After approximately two or three minutes, Tamara approached them and told her father that she was okay. After another few minutes, the officers picked Lawson up and walked him, without handcuffs, to Winkler's cruiser. Winkler reported that Lawson had no difficulty walking.
 {¶ 8} Winkler and Schade permitted Tamara to speak with Lawson at the cruiser. A short time later, Tamara informed the officers that her father was feeling ill and was going to vomit in the car. The officers allowed Lawson to stand outside the cruiser. Soon thereafter, Lawson collapsed and was taken to the hospital.
 {¶ 9} Lawson's version of events after arriving at the church differed dramatically. Lawson testified that he approached a firefighter, told him that his daughter was at the church, *Page 5 
and asked the firefighter to get her. (Based on the evidence at trial, that firefighter was Wallace.) Lawson stated that he asked two or three times for someone to contact his daughter, but everyone was busy and no one took the time to radio for her. Isaacs testified that the fire chief never told Lawson that his daughter was fine. Lawson looked at all the people in the crowd and asked if anyone had seen Tamara. No one knew where she was. While Lawson was with Wallace, he heard a loud boom, and he heard someone say that the gas line had ruptured. Lawson had not yet seen his daughter, and he began to walk toward the fire trucks near the church. Isaacs stated that Lawson had bad knees and could not move very quickly.
 {¶ 10} According to Lawson, as he walked to the fire trucks, "something hit [him] from behind like a ton of bricks and knocked the breath right out of [him] and [he] went down to the ground." Isaacs testified that an officer grabbed Lawson just below the waist and tackled him as if in a football game. The officer that tackled Lawson put his knee into Lawson's back. A second officer put his knee on Lawson's shoulder and pushed his head down. Both officers were on top of Lawson. Isaacs did not hear the officers tell Lawson to calm down or relax.
 {¶ 11} Tamara testified that she observed the "commotion" approximately ten minutes before she realized it was her father on the ground, and she ran up to him. Isaacs, who was about five feet away from the officers, also testified that the officers were on top of Lawson for approximately ten minutes before Tamara ran up to them. Tamara stated that Lawson was very upset but very happy to see her. Lawson told Tamara that he was afraid for her and that no one would tell him that she was alright. Lawson remained on the ground for another ten minutes after Tamara arrived. Tamara stated that Lawson's head was to the side but pushed to the ground, his arm was twisted behind his back, and an officer had his knee in Lawson's back *Page 6 
above his hip. Tamara did not see Lawson struggle.
 {¶ 12} After a total of approximately twenty minutes, the officers picked up Lawson and walked him to a cruiser. Isaacs observed that Lawson was bleeding from his forehead and both Isaacs and Tamara testified that Lawson had gravel in his forehead. Lawson stated that he had been "conked" on the head. Lawson began to feel ill while he was in the cruiser. He stated that an officer told him, "You SOB, if you puke in the car, it'll be the last time you ever puke in a car." After the officer let him out of the cruiser, Lawson was staggering and shaken. A female officer, Officer Hounshell, asked Lawson if he would like to sit in her cruiser and get warm. Lawson walked away, collapsed, and had a seizure. He was transported to the hospital by paramedics.
 {¶ 13} In May 2006, Lawson was charged with misconduct at an emergency, in violation of R.C. 2917.13(A)(3), which provides that no person shall knowingly "[f]ail to obey the lawful order of any law enforcement officer engaged in the law enforcement officer's duties at the scene of or in connection with a fire, accident, disaster, riot, or emergency of any kind." During the trial, Lawson requested jury instructions on the affirmative defenses of necessity and duress. The court denied his request. Lawson was convicted of misconduct at an emergency, a fourth degree misdemeanor. The jury found him not guilty of creating a risk of physical harm to persons, which would have elevated the offense to a first degree misdemeanor. The court sentenced Lawson accordingly.
 II {¶ 14} Lawson's sole assignment of error states:
 {¶ 15} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN FAILING TO *Page 7 
GIVE JURY INSTRUCTIONS CONCERNING THE DEFENSES OF NECESSITY AND DURESS."
 {¶ 16} Lawson claims that the trial court erred when it did not give his proposed jury instructions on necessity and duress.
 {¶ 17} "A trial court must fully and completely give all instructions relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact-finder." State v. Young, Montgomery App. No. 19328, 2003-Ohio-1254, ¶ 9, citing State v. Comen (1990), 50 Ohio St.3d 206,553 N.E.2d 640. A criminal defendant is entitled to an instruction on an affirmative defense if he has introduced sufficient evidence which, if believed, would raise a question in the minds of reasonable people concerning the existence of the issue. State v. Johnson, Montgomery App. No. 21459, 2007-Ohio-5662, ¶ 21. "It is within the trial court's discretion to determine whether the evidence presented at trial is sufficient to require a particular jury instruction." State v.Elijah (July 14, 2000), Montgomery App. No. 18034. The failure to give a requested jury instruction is reversible error if the court's refusal to give the instruction was an abuse of discretion and the defendant suffered prejudice as a result. State v. Griffin (July 15, 2005), Montgomery App. No. 20681, 2005-Ohio-3698. An abuse of discretion connotes more than a mere error of law or an error in judgment; it implies an arbitrary, unreasonable, unconscionable attitude on the part of the court. Johnson at ¶ 21.
 {¶ 18} As noted by Lawson, the defenses of necessity and duress are similar and have been often used interchangeably. City of Dayton v.Thornsbury (Sept. 11, 1998), Montgomery App. Nos. 16744, 16772, citingState v. Cross (1979), 58 Ohio St.2d 482, fn.2, 391 N.E.2d 319. The two defenses "share in common the fact that they provide an excuse, justification or *Page 8 
affirmative defense to a criminal charge." Id.
 {¶ 19} In order to establish the defense of duress, the defendant must demonstrate that he was compelled to commit the crime under threat, by another person, of imminent death or serious bodily injury.Elijah, supra. "The force used to compel the actor's conduct must remain constant, controlling the will of the unwilling actor during the entire time he commits the act, and must be of such a nature that the actor cannot safely withdraw." (Citations omitted) State v. Getsy,84 Ohio St.3d 180, 199, 1998-Ohio-533, 702 N.E.2d 866. Although the actor must subjectively believe that he is being threatened with imminent death or serious bodily harm if he does not commit the crime, that belief must be objectively reasonable based on the evidence. Elijah, supra; State v.Doakes, Montgomery App. No. 18811, 2001-Ohio-6995.
 {¶ 20} In order to prove the defense of necessity, a defendant must establish: (1) a harm due to the pressure of a physical or natural force, rather than human force; (2) the harm sought to be avoided was greater than, or at least equal to that sought to be prevented by the law defining the offense charged; (3) the actor reasonably believed at the moment that his act was necessary and was designed to avoid the greater harm; (4) the actor was without fault in bringing about the situation; and (5) the threatened harm was imminent, leaving no alternative by which to avoid the greater harm. State v. Price, Montgomery App. No. 21370, 2006-Ohio-3856, ¶ 11; State v. Harkness
(1991), 75 Ohio App.3d 7, 598 N.E.2d 836.
 {¶ 21} The main difference between the defenses of duress and necessary is that duress involves a human threat whereas necessity involves a threat from natural or physical forces. Thornberry, supra, citing Katz Giannelli Criminal Law (1995), p. 211, § 91.4.
 {¶ 22} Beginning with duress, none of the evidence supported a conclusion that a person *Page 9 
compelled Lawson to disobey an order of a police officer at the scene of the fire. Although Lawson's fear that Tamara may have been in the burning building was precipitated by his knowledge that she planned to be in the home/church all day to work on the floors and by the disconnected telephone call, Lawson was not forced by another to commit an offense. The trial court did not abuse its discretion in failing to instruct the jury on duress.
 {¶ 23} As for the defense of necessity, Lawson provided evidence that he believed that his daughter was in the burning building. We do not question that the fire was a natural force, and no one has suggested that Lawson was responsible for the church fire. Lawson repeatedly stated that he was intent on finding his daughter, and he had no information about her safety or her whereabouts. According to Lawson, he was heading toward the fire trucks at the corner of the lot near the fire when he was physically stopped by Winkler and Schade. The harm that Lawson apparently sought to avoid was the imminent loss of his daughter's life in the fire. The record indicates that the church was engulfed in flames and ultimately burned to the ground.
 {¶ 24} The evidence, however, does not support the conclusion that Lawson reasonably believed that his actions were necessary to save his daughter. Even accepting Lawson's assertion that he believed his daughter was in the burning building and was in imminent danger, the evidence is undisputed that numerous firefighters were at the scene battling the fire. Lawson testified that "people were hollering" and there was noise and sirens. In stating that no one would give him information about his daughter, he stated that "[everybody's busy. Everybody's running." Wallace testified that eight or nine fire departments responded to the scene; there were water operations in one area and fire equipment closer to the church. Fire Chief Marcus was in command near the church. Stated simply, numerous firefighters who were *Page 10 
trained to fight the fire were on the scene and doing their jobs when Lawson attempted to approach. Lawson could not have reasonably believed that disobeying the officers' orders to stop was necessary to save his daughter from the fire. A reasonable response would have been for Lawson to stop and express his concerns to the officers.
 {¶ 25} Moreover, to the extent that Lawson's actions were motivated by a desire for information about his daughter rather than a desire to save her, the defense of necessity was not appropriate. The need for peace of mind does not trump the need for officers to maintain control over the scene of an emergency.
 {¶ 26} Although we sympathize with Lawson's desire to find his daughter at the scene of the fire, the trial court did not err in failing to instruct the jury on the defenses of necessity and duress. Accordingly, the assignment of error is overruled.
 III. {¶ 27} The judgment of the trial court will be affirmed.
 GRADY, J. and DONOVAN, J., concur. *Page 1