[Cite as *State v. Moore*, 2024-Ohio-6050.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-15 |
| | : | |
| v. | : | Trial Court Case No. 22-CR-0100 |
| | : | |
| AARON MOORE | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on December 27, 2024

. . . . . . . . . . .

COLIN P. COCHRAN, Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Aaron Moore appeals from his conviction for failure to comply with an order or signal of a police officer. For the following reasons, the judgment of the trial court will be affirmed.

**Facts and Procedural History**

{¶ 2}   On February 14, 2022, Moore was indicted on one count of harassment with a bodily substance and one count of failure to comply.   The count of harassment with a bodily substance was dismissed before trial.   Moore was tried by a jury for failure to comply in January 2024.   The jury found Moore guilty, which included making a finding that he had caused a substantial risk of serious physical harm to persons or property. The court sentenced Moore to 36 months, to be served consecutively to a sentence he was then serving in a Cuyahoga County case. The court also suspended Moore's driver's license for five years.

{¶ 3} Before addressing Moore's two assignments of error, we will review the evidence adduced at trial.

Jury Trial

{¶ 4} Officer Courtland Fisher of the Springfield Police Department testified that on February 5, 2022, at around 1:30 a.m. and while on routine patrol, he observed a white Cadillac matching a description he had received earlier in his shift of a vehicle associated with an alleged domestic violence and aggravated menacing incident.   Officer Fisher understood the vehicle to be driven by Moore, and he pulled up and identified a photo of Moore from the Bureau of Motor Vehicles on his computer.   Fisher observed the vehicle at a Shell gas station at Limestone Street and Leffel Lane, and he and his partner, Officer Kyle Shaffer, "pulled in almost nose to nose with the vehicle" and activated their lights. Moore was alone in the Cadillac.   According to Fisher, Moore reversed the Cadillac, turned around in an effort to flee, and became stuck in the snow.   Fisher and Shaffer exited their cruiser and approached the Cadillac with guns drawn, knowing that Moore

was believed to be armed. Fisher testified that, while keeping an eye on Moore, he attempted to break a window on the Cadillac but was unable to do so or to open the doors; meanwhile, Shaffer repeatedly ordered Moore to get out of the vehicle. Shaffer punctured three of the Cadillac's tires in an effort to immobilize it.

{¶ 5} Moore continued "rocking the vehicle trying to get it out of the snowbank." Several times, he put his hands up, dropped his hands down, and then went back to trying to move his vehicle again. Officer Fisher was concerned about a weapon and the officers' safety when Moore lowered his hands. Moore eventually got the Cadillac free from the snow and fled north on Limestone Street. Officers Fisher and Shaffer pursued him.

{¶ 6} Fisher testified that the pursuit occurred during a snowstorm, and the roads were slick. He observed Moore fishtailing and going left of center while oncoming traffic was proceeding southbound. Fisher and Shaffer were going approximately 50 miles per hour, and they radioed other law enforcement units in the area regarding the danger posed by Moore. After being advised by their supervisor to terminate the pursuit, the officers turned off their lights and sirens.

{¶ 7} Fisher observed Moore slow down to make a turn, and Fisher slowed down to follow Moore from a distance. Moore eventually turned into an alleyway, and after stopping his vehicle, "he bailed on foot." Fisher did not know if Moore was stuck in another snowbank or unable to proceed due to the condition of his tires. When Moore began to run, Fisher and Shaffer followed on foot. They observed Moore reach into his waistband while rounding a corner, prompting further concern that he was armed. At

that point, backup officers had arrived at the area. Moore again refused to comply with orders to stop, and he threw snow in Fisher's direction. Fisher sprayed him with pepper spray. After Moore continued to defy orders, another officer tased him and then put him under arrest.

{¶ 8} Fisher's cruiser was equipped with a camera that recorded both video and audio of the encounter with Moore. The video was played for the jury. Fisher stated that another law enforcement vehicle, a "paddy wagon," had arrived on the scene after Moore was stopped.

{¶ 9} Officer Kyle Shaffer testified consistently with Fisher regarding the report of a domestic violence incident and their observation of the reported vehicle at the Shell station. Shaffer immediately drew his weapon upon exiting the cruiser. Noting that there was not enough room under Moore's vehicle to deploy "stop sticks," Shaffer punctured both rear tires and the front driver's side tire in an attempt to prevent Moore from fleeing. Shaffer stated that Moore continued to put the vehicle in forward and reverse in an effort to get the car unstuck from the snow, while Shaffer repeatedly ordered him to put the car in park and show his hands.

{¶ 10} Shaffer stated that, per department policy, the officers were permitted to continue their pursuit of Moore at or below the posted speed limit after Moore had slowed his vehicle. When Moore fled on foot, Shaffer was unsure if he was reaching for a weapon in his waistband or trying to hold up his pants. Moore "got around some buildings, went back out northbound on the street," and then stopped when he was "cut off" by some other officers. Although he stopped his flight, Moore refused to put his

hands behind his back. After Fisher sprayed Moore with pepper spray, Moore continued to yell and refused to comply with orders, so Shaffer tased him once, causing him to fall to the ground. Moore was then arrested.

{¶ 11} On cross-examination, Shaffer stated that after being advised to stop the pursuit of Moore due to traffic and weather, Fisher, who was driving, turned off the cruiser's lights, siren, and camera. Shaffer stated that he and Fisher radioed their location and the direction in which Moore was fleeing to other officers, which helped other officers to intercept him.

{¶ 12} Regarding the initial encounter at the gas station, Shaffer denied verbally threatening to shoot Moore. With respect to the officers' belief that Moore was armed, Shaffer stated that Moore's wife or girlfriend had reported that he had threatened her with a firearm. After Moore was arrested, Shaffer backtracked along Moore's pedestrian path looking for a weapon and did not find one. Moore also did not have a weapon on his person, and no weapon was found in his vehicle.

{¶ 13} Officer Adam Schaefer testified that, on the date of Moore's arrest, he was a passenger in a police van commonly known as a "paddy wagon," which was driven by Officer Josh Clark. When Schaefer arrived at the scene of Moore's arrest, officers were deploying pepper spray and a taser, each of which was used one time. Videos from the van were played for the jury.

{¶ 14} At trial, Moore testified that he was then incarcerated in Cuyahoga County for attempted robbery, because he had been "with the wrong people at the wrong time" after the failure to comply incident. Moore had also served prison terms in 2012, 2016,

2018, and 2020. At the time of the instant offense, Moore was in contact with his wife, Brianna, to whom he had been married since 2015. He characterized the nature of their relationship as "poor." In January 2024, Brianna allegedly threatened Moore in a text message. On February 4, 2024, at 1:00 p.m., Moore took Brianna's phone from her at the Comfort Inn in Springfield and left with it. Brianna was "livid" in response. At the time, Moore was "conflicted with her," their children were present, and Brianna was "screaming" at Moore. Moore stated that Brianna had been "screaming threats of having the police do [him] harm." According to Moore, Brianna stated, "I can't believe you're not dead yet," and she told him that Officer Bowers was going to kill him.

{¶ 15} When asked if Brianna was in a relationship with Officer Bowers, Moore responded that "[s]omething was going on" and that, once, when he was leaving for work, there was a law enforcement SUV "just sitting behind the house." Moore did not "know of any type of kind of off-and-on relationship" and was "just trying to be a part of the kids' life."

{¶ 16} Moore testified that he was very concerned when Brianna made the comment about Bowers and that he was "scared for [his] life" during his encounter with the police. According to Moore, the first thing he heard upon the officers' approach to his vehicle at the gas station was "put your f…… hands up or I'll blow your f…… brains out." Moore tried not to look at the officers and was "steering the wheel left and right, putting it in reverse, putting it in forward." Moore's testified that his hands were in plain sight, and he "never moved them past the top of the steering wheel or the shifter" on the steering column.

{¶ 17} According to Moore, he thought that the officer must be the guy Brianna had been talking about, and he said "please don't shoot me. I have kids." He stated that Officer Shaffer "kept threatening" him and "pounding on the window repeatedly with the end of a knife, like the safety part that breaks the window if you go under water." Moore recounted that he had "stopped hearing what he was saying" and "just wanted to get away from him." Moore saw Shaffer stab his left front tire and both rear tires. Moore believed that the only thing he had been doing wrong was driving under suspension.

{¶ 18} Moore stated that, as he proceeded down South Limestone, he noticed that the officers had backed off, but their lights were still on behind him, which he considered "highly odd." Moore said he was only going 15-20 mph, after having initially gone up to 25 mph when he first pulled away. Moore testified that he couldn't get the car "to go to speed" because it wouldn't stay in the lane and the tires were going flat.

{¶ 19} Moore testified that he headed toward the jail to pull in there, because he knew there were cameras there; Moore thought he would be safe there, noting that he didn't know what was going on. While on Limestone, Moore looked to his left and observed an Ohio State Trooper with his lights off and his door open; he testified that the trooper "fired at [him] not once, but twice, with an assault style rifle." According to Moore, the first shot hit the tire, and Moore immediately "felt all control of the car gone." He did not know what else to do but to get out and run, and he worried about who was going to raise his kids. Once he was out of his car, Moore was "trying to . . . run for dear life." Moore denied that he ever had a gun.

{¶ 20} On cross-examination, Moore acknowledged his conviction on two counts

of attempted aggravated robbery and having weapons while under disability following events that occurred on February 15, 2024. He also acknowledged that he did not file a report after allegedly being shot at by the trooper and he did not have any record of Brianna's alleged threatening text message.

{¶ 21} On redirect examination, Moore stated that he learned of a bullet hole in his vehicle after reviewing discovery, which included a black and white photograph of his car showing the bullet hole.

{¶ 22} On rebuttal, Fisher testified that Officer Bowers had not been part of the pursuit of Moore and that he had used a flashlight in an effort to break Moore's window, not a knife. Fisher was not aware of any Ohio State Patrol Officers in the area on the night of Moore's arrest and had not observed any bullet holes in Moore's car.

### Weight of the Evidence

{¶ 23} Moore asserts two assignments of error. His first assignment states:

> AARON MOORE'S . . . CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 24} Moore asserts that his actions leading to his arrest occurred in an attempt to protect himself from imminent physical harm or death based upon threats made by Brianna. He argues that, when "[s]everal police cruisers" turned into the gas station parking lot and activated their overhead lights on the day in question, he thought his life was in danger because of "the frame of mind created by his wife's threats that the police were going to kill him." According to Moore, when several officers exited their cruisers with guns drawn and approached his vehicle, that further confirmed his suspicion that

they were there to kill him. Moore points to the evidence of a bullet hole in his vehicle and that fact that, after fleeing on foot, he was pepper-sprayed and tased "multiple times."

{¶ 25} Accordingly, Moore argues that he committed the acts leading to his arrest "through a combination of self-defense and necessity." Alternatively, he argues that he committed the acts leading to his arrest because he was under duress. He argues that "the jury clearly lost its way" in concluding that he had not established an "affirmative defense that he was disregarding the orders and signals of the officers because he feared that the officers were going to kill him," i.e., acting in self-defense or under duress.

{¶ 26} Moore asserts that he knew Brianna was having an affair with Bowers and that he attempted to flee to the jail for safety. Moore argues that, in "accordance with Ohio self-defense law, he was not at fault in creating the violent situation because he was receiving threats from Brianna that the police pursuing him were going to kill him." According to Moore, he also did not violate any duty to retreat or avoid danger, because in fact he did everything in his power to retreat from the confrontation.

{¶ 27} Finally, Moore argues that "under Ohio's duress law, [he] was compelled to commit the crime under his subjective belief of threat, by the Springfield police officers, of imminent death or serious bodily injury." Moore "believed the threat to remain constant, controlling the will of Moore during the entire time he committed the acts leading to his arrest, and Moore could not safely withdraw or remove the threat."

{¶ 28} The State responds that, although an officer could be heard on the recording advising Moore that he would shoot if Moore reached for a gun, there "was never a threat of the type [Moore] alleged." Further, according to the State, the photos

of Moore's vehicle did not depict a bullet hole as Moore described. The State asserts that Moore "essentially conceded" that the State had proven the elements of failure to comply, but he argued that "he was in fear for his life, so he ran."

{¶ 29} A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.), citing *State v. Hufnagel*, 1996 WL 501470, *3 (Sept. 6, 1996). The proper test to apply to a manifest weight of the evidence inquiry is set forth in *State v. Martin*, 20 Ohio App.3d 172, 175 (1983), which states: "[T]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Wilson* at ¶ 12-13, citing *Martin* at 175. "In order to find that a manifest miscarriage of justice occurred, an appellate court must conclude that a guilty verdict is 'against,' that is, contrary to, the manifest weight of the evidence presented." *Id.* at ¶ 14, citing *State v. McDaniel*, 1998 WL 214606 (May 1, 1998).

{¶ 30} The credibility of the witnesses and the weight to be given to their testimony are matters primarily for the trier of fact to resolve. *Id.* at ¶ 15, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967). In *State v. Lawson*, 1997 WL 476684 (Aug. 22, 1997), we explained:

Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of

appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

*Id.* at *4. Thus, we will not substitute our judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *See Wilson* at ¶ 17, citing *State v. Bradley*, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 31} The trier of fact is in the best position to consider inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. *State v. Petty*, 2012-Ohio-2989, ¶ 38 (10 Dist.), citing *State v. Williams*, 2002-Ohio-4503, ¶ 58 (10th Dist.). Consequently, an appellate court must give great deference to the fact finder's determination of the witnesses' credibility. *Id.* "To that end, the fact finder is free to believe all, part or none of the testimony of each witness appearing before it." *Id.*, citing *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.). "Mere disagreement over the credibility of witnesses is not sufficient reason to reverse a judgment." *Id.*, citing *State v. Wilson*, 2007-Ohio-2202, ¶ 24.

{¶ 32} Additionally, "[t]he fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2014-Ohio-3432, ¶ 24 (2d Dist.). "It is well-established that when conflicting evidence is presented at trial, a conviction is not against the manifest

weight of the evidence simply because the trier of fact believed the prosecution testimony." *In re M.J.C.*, 2015-Ohio-820, ¶ 35 (12th Dist.).

{¶ 33} Failure to comply is statutorily defined as: "[n]o person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." R.C. 2921.331(B). A violation is a felony of the third degree if the trier of fact finds by proof beyond a reasonable doubt that the offender's operation of the vehicle caused a substantial risk of serious physical harm to persons or property. R.C. 2921.331(C)(5).

{¶ 34} Moore did not dispute that he willfully failed to comply with repeated orders to get out of his car before fleeing or that the officers pursued him with lights and siren activated in an effort to get him to stop. The video of Fisher and Shaffer's initial approach and interaction with Moore was fully consistent with their testimony and inconsistent with Moore's assertion that "several cruisers" entered the gas station parking lot. Fisher and Shaffer's cruiser was the only cruiser visible in the video. The video showed snow falling and Moore's vehicle stopped at an entrance/exit to the parking lot, perpendicular to Limestone, when the officers turned right into a head-to-head position with Moore's vehicle. Moore rapidly reversed back into the parking lot and then became stuck in the snow parallel to Limestone. Both officers approached and issued repeated commands to stop, while Moore's vehicle continued to rock back and forth. Fisher was depicted attempting to break the driver's side window and open the door, and Shaffer could be seen slashing the rear tires. Shaffer eventually holstered his weapon and moved behind Fisher while Fisher kept his weapon pointed at Moore. Shaffer then slashed the driver's

side front tire. Moore then pulled out onto Limestone and fled. The encounter at the gas station lasted about three and a half minutes. The officers then ran to their cruiser to pursue Moore. Oncoming traffic was light, and there was snow on the roadway. One of the officers could be heard saying (presumably to other officers): "Whoever's up there, watch out, he's fishtailing." One of the officers also stated that Moore posed a "f…… danger."

{¶ 35} In a second video, visibility is poor due to glare from the cruiser's headlights, but loud commands to Moore to show his hands could be heard, and multiple officers approached Moore on a residential street. Moore fell down in the course of the altercation. He was then brought forward and could be heard yelling.

{¶ 36} The third video depicts the back section of the police van with metal bench seats on either side. Before the door was opened, Moore was belligerent, yelling at several officers and using extensive profanity in calling them names. He appeared to be larger in stature than the other officers and remained loud and defiant as the door to the van was opened. Five officers were involved in moving Moore into the vehicle, one of whom pointed a taser in his direction. Moore's loud profanity and shrieks continued after the doors to the van were closed; after he got off the floor and onto a bench seat, he appeared to aggressively kick an area of the van in front of him.

{¶ 37} We have viewed a color photograph of the driver's side of Moore's vehicle presented by the State and a black and white photograph of the vehicle presented by Moore. We agree with the State that the alleged bullet hole is not visible in either photograph.

{¶ 38} We note that the jury was not instructed on self-defense, necessity, or duress, although Moore was permitted to assert that he was in fear of imminent death at the hands of law enforcement. Having reviewed the entire record, we cannot conclude that the jury lost its way in resolving conflicts in the evidence or created a manifest miscarriage of justice. The jury observed all the witnesses and heard their testimony, and it credited the officers' testimony over that of Moore. We give great deference to its assessment of credibility.

{¶ 39} The video of the officers' attempt to detain Moore reflects that he willfully eluded multiple, continuous visual and audible signals to bring his vehicle to a stop. Although the officers used profanity in ordering Moore to stop the car, the alleged threat to blow his brains out is not audible on the video. The officers had reason to believe that Moore was armed based upon the prior report of domestic violence and aggravated menacing. When he freed his car from the snow at the gas station, Moore continued to flee from the officers despite the lights and siren behind him.

{¶ 40} Moore argues that "the jury clearly lost its way in determining whether the burden of evidence was met to support his affirmative defense[s] that he was disregarding the orders and signals of the officers because he feared that the officers were going to kill him." We disagree. There was no evidence other than Moore's testimony that Brianna had caused Moore to believe that the officers were out to kill him. Officer Bowers was not involved in the encounter with Moore, and there was no evidence that an Ohio State Patrol officer shot at Moore's vehicle. Moore's belligerent and defiant demeanor on foot in the street -- and upon being detained by multiple offers after having been

pepper-sprayed and tased -- contradicted his assertion of fear of imminent physical harm or death. Moore's conviction for failure to comply with an order or signal of a police officer was not against the manifest weight of the evidence.

{¶ 41} Moore's first assignment of error is overruled.

**Ineffective Assistance of Counsel**

{¶ 42} Moore's second assignment of error states:

MOORE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 43} Moore asserts that defense counsel was ineffective because he failed to present any evidence to corroborate Moore's testimony, failed to request a jury instruction for Moore's affirmative defenses, and failed to "preserve the record for the same."

{¶ 44} Although set forth in response to Moore's first assignment of error, the following arguments by the State are best addressed as part of our analysis of Moore's second assignment of error. The State argues that Moore asks this court to recognize plain error, because he did not request any jury instructions on affirmative defenses at trial or object to their omission. The State further argues that self-defense is not applicable to a situation in which law enforcement officers are acting within their duties and not using excessive force, and there "was no reasonable belief that the officers were there to cause [Moore] physical harm, as he claimed."

{¶ 45} The State contends that the "justification defense that fits more squarely within these facts is the theory of necessity or duress," but the evidence did not support those instructions because a reasonable person could not have concluded that Moore was acting under duress or out of necessity. The State asserts that plain error is not

demonstrated.

**{¶ 46}** To prevail on a claim of ineffective assistance of counsel, an appellant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984): Moore must show that counsel's performance was deficient and that he was prejudiced by the deficient performance. *Id.* at paragraph two of the syllabus. "In reviewing a claim of ineffective assistance of counsel, '[t]rial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance.' " *State v. Coben*, 2002-Ohio-914, *2 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524 (1992), citing *Strickland* at 687-89. "In addition, the error must be so egregious that counsel 'was not functioning as the "counsel" that the Sixth Amendment guarantees.' " *Id.*, citing *Cook*.

**{¶ 47}** We will first review Moore's claims regarding instructions on affirmative defenses. An affirmative defense is a "defense involving an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence." R.C. 2901.05(D)(1)(b). "To establish self-defense, the evidence must show (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." *State v. Santana*, 2022-Ohio-4118, ¶ 29 (2d Dist.). "If the evidence shows beyond a reasonable doubt that at least one of these three elements is missing, a defendant cannot establish self-defense." *Id.*

**{¶ 48}** The defense of necessity excuses or justifies conduct which is otherwise

prohibited by law. The common-law elements of the defense are:

(1) the harm must be committed under the pressure of physical or natural force, rather than human force; (2) the harm sought to be avoided is greater than (or at least equal to) that sought to be prevented by the law defining the offense charged; (3) the actor reasonably believes at the moment that his act is necessary and is designed to avoid the greater harm; (4) the actor must be without fault in bringing about the situation; and (5) the harm threatened must be imminent, leaving no alternative by which to avoid the greater harm.

*Kettering v. Berry*, 57 Ohio App.3d 66, 68 (2d Dist. 1990); *see also State v. Prince*, 71 Ohio App.3d 694, 699 (4th Dist. 1991).

**{¶ 49}** Finally, we have discussed the defense of duress as follows:

In order to establish the defense of duress, the defendant must demonstrate that he was compelled to commit the crime under threat, by another person, of imminent death or serious bodily injury. *State v. Lawson*, Montgomery App. No. 22155, 2008-Ohio-1311, ¶ 19, citing *State v. Elijah* (July 14, 2000), Montgomery App. No. 18034. "The force used to compel the actor's conduct must remain constant, controlling the will of the unwilling actor during the entire time he commits the act, and must be of such a nature that the actor cannot safely withdraw." *Id.,* citing *State v. Getsy*, 84 Ohio St.3d 180, 199, 1998-Ohio-533. Although the defendant must subjectively believe that he is being threatened with imminent death

or serious bodily harm if he does not commit the crime, that belief must be objectively reasonable based on the evidence. *Elijah, supra; State v. Doakes*, Montgomery App. No. 18811, 2001-Ohio-6995.

*State v. Longstreth*, 2011-Ohio-1825, ¶ 12 (2d Dist.).

**{¶ 50}** "One of the essential features of a necessity or duress defense is the sense of present, imminent, immediate and impending death, or serious bodily injury." *State v. Cross*, 58 Ohio St.2d 482, 487 (1979). "It must be understood that the defense of necessity or duress is strictly and extremely limited in application and will probably be effective in very rare occasions. It is a defense and not a conjured afterthought." *Id.* at 488.

**{¶ 51}** Moore did not object to the jury instructions provided by the court, and he accordingly waived all but plain error. *State v. Bahns,* 2009-Ohio-5525, ¶ 25 (2d Dist.). Plain error exists "if the trial outcome would clearly have been different, absent the alleged error in the trial court proceedings." *State v. Rollins*, 2006-Ohio-5399, ¶ 14 (2d Dist.). "Plain error may be invoked only in rare cases, and no error constitutes plain error unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Rutherford*, 2002-Ohio-1214 (2d Dist.), citing *State v. Campbell*, 69 Ohio St.3d 38, 41 (1994). To prevail under the plain-error doctrine, Moore must establish that " 'an error occurred, that the error was obvious, and that there is "a reasonable probability that the error resulted in prejudice," meaning that the error affected the outcome of the trial.' " *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, quoting *State v. Rogers* 2015-Ohio-2459, ¶ 22; *see also State v. Wilks*, 2018-Ohio-1562, ¶ 52.

**{¶ 52}** We conclude that neither plain error nor ineffective assistance of counsel is demonstrated. On this record, defense counsel may have reasonably concluded that arguing these affirmative defenses was not a viable trial strategy. As noted above, the defenses required a bona fide belief that Moore was in imminent danger of death or great bodily harm (self-defense), that the harms threatened were imminent (necessity), or that a threat of "imminent death or serious bodily injury" existed (duress).

**{¶ 53}** As the State points out, self-defense in the context of interactions with law enforcement is most often associated with resisting arrest or assault offenses on a peace officer, not failure to comply. *See State v. Elk*, 2020-Ohio-4466, ¶ 47 (2d Dist.) ("[B]ased on the facts and circumstances of this case, there was sufficient evidence to support Elko's request that the trial court instruct the jury that the officers' use of excessive force serves as a complete defense to the charge of resisting arrest."); *State v. Fritz,* 2005-Ohio-4736, ¶ 25 (2d Dist.) ("there is a reasonable probability that the jury, if given an instruction on self-defense, might have concluded that Fritz had acted in self-defense when he injured Knight's hand while trying to remove it from his face. Accordingly, we cannot conclude that Fritz was not prejudiced by his trial counsel's conduct.").

**{¶ 54}** Defense counsel may have chosen, as a matter of trial strategy, not to argue that Moore had reasonably feared imminent death such that his flight from the police in snowy conditions – which put the officers and others on the road at substantial risk of serious physical harm -- was justified. Such a choice was supported by the fact that alleged domestic violence and aggravated menacing were the reason the officers attempted to initially stop Moore and believed he could be armed. The video made clear

that Moore was given ample opportunity to stop and get out of his vehicle. That the officers continually ordered Moore to exit his vehicle for three minutes before he fled contradicted Moore's suggestion that they intended to kill him immediately, as did evidence that Officer Shaffer holstered his weapon. Moreover, the officers slowed their pursuit of Moore due to road conditions. There was no evidence that the State Highway Patrol was involved in locating or arresting Moore, and he did not file a report of the alleged shooting of his vehicle by a state trooper. The situation that allegedly compelled Moore's flight did not arise from natural events or physical conditions. Even if we were to conclude that counsel was ineffective in failing to request jury instructions on self-defense, necessity, or duress (which we do not), we cannot conclude that such instructions would have altered the outcome of the trial. Plain error is not demonstrated.

{¶ 55} Finally, Moore seems to suggest that counsel was ineffective for failing to obtain and introduce evidence of an alleged threatening text message from Brianna to his phone to corroborate his testimony. By his own testimony, this message was sent a month before the incident in question, and Moore does not establish how that message could have altered the outcome of the trial. Moore testified repeatedly that Brianna had threatened him and told him that Bowers would kill him. In light of the video evidence of Moore's encounter with the police and the jury's decision to credit the officers' testimony over Moore's, we cannot conclude that, if the alleged threatening message had been obtained by defense counsel, the outcome of the proceedings would have been different. Ineffective assistance of counsel is not demonstrated, and Moore's second assignment of error is overruled.

**Conclusion**

**{¶ 56}** Moore's conviction for failure to comply was not against the manifest weight of the evidence.   Plain error and ineffective assistance of counsel are not demonstrated in counsel's failure to request affirmative defense instructions or to obtain an alleged threatening text message.   Having overruled Moore's assignments of errors, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and TUCKER, J., concur.