[Cite as *State v. Savage*, 2025-Ohio-1206.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-12 |
| | : | |
| v. | : | Trial Court Case No. 2023 CR 104 |
| | : | |
| TOBY WAYNE SAVAGE | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 4, 2025

. . . . . . . . . . .

ERIC J. ALLEN, Attorney for Appellant

KARA N. RICHTER, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Toby Wayne Savage appeals from his convictions of several drug offenses, two counts of endangering children, and one count of furnishing a firearm to a minor. He asserts that his convictions on the drug offenses were against the manifest weight of the evidence, that the trial court erred in excluding certain evidence that he sought to

admit, and that the trial court erred in failing to consider his ability to pay fines and court costs.   For the following reasons, the judgment of the trial court will be affirmed.

**Facts and Procedural History**

{¶ 2}   On June 5, 2023, Savage was indicted on several drug offenses: two counts each of possession and trafficking of hashish and one count each of possession and trafficking of marijuana.   He was also indicted on three counts of endangering children and one count of improperly furnishing firearms to a minor. The drug and firearm offenses each had an attendant firearm specification.

{¶ 3} Savage was tried by a jury in March 2024 and was found guilty of all the offenses and firearm specifications.   The court merged the possession offenses into the respective trafficking offenses and merged two of the endangering children offenses. The court proceeded to sentencing on three counts of trafficking, two counts of endangering children, one count of furnishing firearms to a minor, and the firearm specifications.    The court sentenced Savage to indefinite terms of three to 4.5 on the three trafficking offenses, to 150 days and 180 days respectively on the endangering children offenses, and to ten months for furnishing firearms to a minor.   These sentences were ordered to be served concurrently. The court imposed one-year prison terms on two firearm specifications, to be served consecutively to each other and consecutively to the concurrent terms.   Thus, the aggregate sentence was five to 6.5 years.    The court also imposed fines totaling $19,500.

{¶ 4} Savage appeals, raising four assignments of error.

**Weight of the Evidence**

{¶ 5} In his first assignment of error, Savage asserts that the jury's findings of guilt on the six drug offenses charged in the indictment (Counts 1-6) were against the manifest weight of the evidence. Specifically, Savage asserts that he demonstrated the hashish and marijuana at issue in these counts had been legally purchased from a legitimate Tennessee business through his limited liability corporation, for which he had obtained an identification number for tax purposes. According to Savage, he likely would not have been prosecuted if his inventory had been "in a brick-and-mortar store." He also argues that the State did not present any evidence as to the source of the material, only its potency, and that it was "entirely possible that it was hemp, perfectly legal at the time of sale," but that it subsequently "decarboxylated" (i.e., underwent a change in its chemical composition), which increased its potency and led to the heightened potency testified to by the State's expert. Finally, Savage asserts that his "lack of clients or connections made in the drug trade" and the absence of notes, ledgers, and confidential informants who could attest to Savage's sale of drugs indicated that he did not possess the drugs "for sale or a trafficking operation."

{¶ 6} A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.), citing *State v. Hufnagel*, 1996 WL 501470, *3 (Sept. 6, 1996). The proper test to apply to a manifest weight of the evidence inquiry is set forth in *State v. Martin*, 20 Ohio App.3d 172, 175 (1983), which states:

. . . [T]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. . . .

"In order to find that a manifest miscarriage of justice occurred, an appellate court must conclude that a guilty verdict is 'against,' that is, contrary to, the manifest weight of the evidence presented."   (Citation omitted.)   *Wilson* at ¶ 14.

{¶ 7} The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of fact to resolve. *Id.* at ¶ 15, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967).

Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

*State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997).

{¶ 8} Additionally, the trier of fact is in the best position to consider inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.   *State v. Petty*, 2012-Ohio-2989, ¶ 38 (10th Dist.), citing *State v.*

*Williams*, 2002-Ohio-4503, ¶ 58 (10th Dist.). "To that end, the fact finder is free to believe all, part or none of the testimony of each witness appearing before it." *Id.*, citing *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.). "Mere disagreement over the credibility of witnesses is not sufficient reason to reverse a judgment." *Id.*, citing *State v. Wilson*, 2007-Ohio-2202, ¶ 24. Moreover, "[i]t is well-established that when conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *In re M.J.C.*, 2015-Ohio-820, ¶ 35 (12th Dist.). Thus, we will not substitute our judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *See Wilson*, 2009-Ohio-525, at ¶ 17 (2d Dist.), citing *State v. Bradley*, 1997 WL 691510, *4 (2d Dist. Oct. 24, 1997).

{¶ 9} With these standards in mind, we will review the evidence presented at trial. Savage directs our attention particularly to the testimonies of Sgt. Curnette, forensic scientist Woolford, and Ageny Guryko, as well as his own testimony.

{¶ 10} We note that the events giving rise to this matter began with the death of Savage's 12-year old son and a subsequent search of Savage's property pursuant to a search warrant. The coroner who performed the autopsy on the child determined that his manner of death was suicide by means of a gunshot wound to the head.

{¶ 11} Sergeant Scott Curnette of the Champaign County Sheriff's Office testified that on October 25, 2022, he responded to a call that a 12-year old child had fallen down the stairs at Savage's home. Curnette subsequently learned that the child had a gunshot wound to the head, and the injury was not accidental. Curnette advised Sergeant Ryan

Black to respond to Savage's address and "freeze it" until a search warrant could be obtained. Curnette assisted in the execution of the search warrant and located a Ruger .22 revolver in the child's bedroom, with five rounds in the cylinder as well as a spent cartridge in the sixth chamber, directly under the hammer.

{¶ 12} Curnette had 33 years of law enforcement experience and testified that, when he arrived at the residence, the "unusual smell that stood out to [him] was the strong odor of marijuana." He stated that after the execution of the search warrant, he discovered and weighed over 47 pounds of marijuana at the address.

{¶ 13} Eric Holmes, the Chief Deputy for the Champaign County Sheriff's Office, responded to the Savage residence to assist in executing the search warrant. He testified that there were firearms in "virtually every room" in the residence and that there was ammunition throughout the residence as well. Several of the firearms were loaded, and a few had rounds in their chambers such that Holmes "had to render them safe."

{¶ 14} Detective Anthony Sells of the Champaign County Sheriff's Office testified that he met Savage and his wife at the hospital after their son was taken there by CareFlight. Sells then proceeded to the Savage residence. After a search warrant was obtained, he assisted in documenting the items that were located at the scene. He identified a Ruger revolver, which the parties stipulated had been found in the deceased son's bedroom and was operable. The parties further stipulated that a spent .22 casing found at the scene had been discharged from that weapon.

{¶ 15} Sells identified numerous items that were seized as a result of the search warrant and admitted into evidence. These included: a very large number of bags, jars,

and vacuum-sealed packages of marijuana, dozens of packages of edibles, storage containers and boxes containing bags of marijuana, and 60 packs of "Glo Extracts THC" in boxes. They also included the following items, which were specifically relevant to expert testimony that will be discussed below:

15. Box containing bags of marijuana

15 A-R. 17 vacuum-sealed bags of marijuana

. . .

18. 1 large mason jar containing brown powdery substance

19. 1 large Rubbermaid container with red lid containing brownish powder

20. 41 plastic containers with wax-like substance in box; 1 clear round container with green lid with crystal-like substance; 1 plastic container of wax-like substance

21. Three individual boxes of "Gold Coast Clear Winter Edition (THC vape cartridges), with one cartridge removed

Sells further identified nine envelopes containing cash in amounts ranging from $18.48 to $24,365, and 21 weapons, including pistols, revolvers, shotguns, and rifles.

{¶ 16} During Sells's testimony, defense counsel objected to his characterization of the green vegetative substances located in the home as marijuana. Sells stated that he had 22 years of law enforcement experience on road patrol and in the detective division, and he had often sent "green vegetative substances" for testing that were proven to be marijuana. Sells also stated that the odor of unburnt marijuana is "very distinct," and he noted that odor in the Savage residence.

{¶ 17} Sells stated that some of the firearms found in the home had been loaded,

and none of them had been secured in a manner that restricted access to them. Sells also retrieved weapons from the pole barn at the Savage property that were not secured, and the parties stipulated to the number of firearms found there. According to Sells, Savage told him at the hospital that his children did not have access to the firearms in his home.

{¶ 18} The court designated Elizabeth Woolford an expert in drug analysis; she was a forensic scientist in the Drug Chemistry Section at the Bureau of Criminal Investigation, with experience in analyzing plant material to determine the presence of marijuana. Woolford testified that she had analyzed vegetation, oil, and wax substances retrieved from the Savage address and had prepared a report.

{¶ 19} Woolford described drug analyses she performed and her conclusions. She stated that State's Exhibits 21 and 22 contained hashish in liquid form and that they were commercially manufactured products containing 834 cartridges. According to Woolford, Gold Coast Clear (Exhibit 21) is "a brand that we see quite often in the laboratory." State's Exhibits 19 and 20 were found to contain hashish in solid form. With respect to Exhibit 15, vacuum sealed bags of suspected marijuana, Woolford stated that she had weighed all 17 bags and found a total weight to be 7,120.2 grams. She had randomly selected and tested 13 of the 17 bags using hypergeometric sampling, which was "a statistically valid sampling plan" that allowed an inference to be drawn about the content of the total items from testing a percentage of individual homogenous samples. Woolford testified that hemp, which is legal, is defined in the 2018 Farm Bill as "a cannabis plant

with .3 percent THC or less."[1]  However, all of the bags she tested were above .3 percent. Woolford testified that, if any of the samples had "come out different or negative," she would have abandoned the "sampling plan" and tested "every single bag."  Woolford testified that all of her findings were made to a reasonable degree of scientific certainty.

{¶ 20} On cross-examination, Woolford further testified that hemp and marijuana are both cannabis, and that the vegetation she tested was marijuana, not hemp.  She explained: "THC-A is an acid form of THC, which is the psychoactive substance in marijuana."  "Decarboxylation happens when [the vegetation is] dried or when it's heated and the acid portion, that molecule falls off and it goes from THC-A to THC.  That happens when a plant is dried or when it's heated, as in it's smoked."  Woolford stated that "[i]t's the development of the amount of THC that determines whether it is a hemp or a marijuana plant."

{¶ 21} Defense counsel questioned Woolford as follows:

Q.  I'll show you what's been marked as Defense Exhibit D, which is a report of the THC analysis of some hemp from Tennessee.

A.  Okay.

Q.  Could that hemp, which is legal, be the same hemp as that?

A.  I can't speak to that at all.

Q.  Okay.  So you don't know?

A.  I tested that marijuana, and that's all I can speak to.

. . .

---

[1] Tetrahydrocannabinol (THC) is the psychoactive substance in marijuana.

Q.   So you cannot confirm or deny that any of these things started as hemp?

A.   I do not speak to where the plant came from.   I can tell you what the THC content is right now - -

Q.   Okay.

A. - - in that bag.

Q.   So you can't confirm it was hemp?

A.   There's no point where a hemp plant will develop that amount of THC, except when it's a small seedling.   But my job is to test the amount of THC at that point and, at that point, it is marijuana.

{¶ 22} On redirect, Woolford testified that harvested hemp will not turn into marijuana.   She stated that she tests for THC and THC-A, and those numbers are combined for the total THC value; "if it was .3 or less, that would be THC-A and THC, and those would never increase."   Woolford testified that none of her testing had produced any scientific evidence or basis for concluding that the items tested "were hemp at any point in time."

{¶ 23} On recross-examination, Woolford testified that THC, as defined in the Ohio Revised Code, is the combination of THC and THC-A.   Accordingly, in examining the vegetative substance, "we test delta-9 THC, we get a percentage.   We also test THC-A, get that percentage."   Then, because "THC-A is a larger molecule because it has a bigger part to it because of the acid, we multiply that by 0.877.   That is a scientifically proven number, the ratio between THC size and THC-A size."   Those numbers are

combined to arrive at the total THC, which is defined in the Ohio Revised Code.

{¶ 24} George Gyurko, a Special Agent Supervisor for the Ohio Attorney General's Office, Bureau of Criminal Investigation, Narcotics Section, and the Marijuana Coordinator for the Ohio Cannabis Suppression Unit, was designated an expert witness in the field of narcotics trafficking. Guryko testified that he had reviewed the evidence collected by the sheriff's office in this case, which consisted of a large amount of marijuana, but "it was broken down in 102 compartments or bags." According to Guryko, this packaging was consistent with resale and not personal use. He stated that approximately $63,000 in cash was recovered "really nearby" the marijuana, which was "a lot of money that's kept at hand." Moreover, the cash had been also separated into piles and, in Guryko's experience, "people try to hide assets and try to limit their exposure so you spread your money out so you don't all your eggs in one basket."

{¶ 25} Noting the large number of firearms found at the Savage property, Guryko further testified that, in his experience, people who sell drugs also keep guns for multiple reasons, including their own protection. Drug dealers also invest in firearms because they typically hold their value or appreciate, in order to "diversify large amounts of cash." Guryko stated a large amount of jewelry was also found at the Savage property, but he did not know its value. According to Guryko, firearms and jewelry are often bartered for drugs.

{¶ 26} Guryko further noted that rubber bands were found at the scene, and those are often used in the drug trade to bundle cash in increments of $100 or $1,000. Guryko had also reviewed three years of Savage's bank records, and he testified that the large

amount of money coming in in "round numbers" was indicative to him of cash deposits. Specifically, Guryko noted deposits of $15,000, $4,000, and $3,000, and he stated that approximately $128,000, in round numbers, was deposited into that account; there had also been a large "investment" of about $50,000 through a crypto currency.

{¶ 27} Guryko identified a document he classified as a "ledger"; it contained the words "carts," which he believed to be an abbreviation for vape cartridges, and "flower," which he interpreted to mean the bud of a marijuana plant. Guryko testified that the street value of hemp is up to $50 a pound, while the street value of marijuana is $1,500 to $4,000, "depending on the THC level" and the area of the county where it is sold. Guryko testified that the ledger did not contain the names of any individuals. He also testified that someone making large sums of money from selling marijuana could launder it by claiming that deposits were actually profits from selling hemp.

{¶ 28} Finally, Savage testified on his own behalf. He testified that he had served in the Army, where he had received firearms training, and that he had been deployed to Iraq and Afghanistan. He had also worked as a contractor for the Department of Defense. In 2005, he obtained a peace officer certification, and he had worked for the Village of St. Paris in Champaign County and the Village of Tremont in Clark County.

{¶ 29} Savage stated that he had sustained multiple injuries in the course of his military career and was put on a "cocktail" of medications at the VA. He discovered hemp-derived THC while researching alternative treatments for his father, who had terminal cancer. After experimenting with different types of hemp-derived THC, Savage was able to reduce his daily medication intake from 40 pills a day to one pill a day.

**{¶ 30}** According to Savage, based upon his own results, he began to help others find THC by directing them to websites, research, and companies from which to buy. He testified that he had helped veterans, first responders, lawyers, doctors, judges, and anyone else that asked; those individuals suggested to Savage that he start a local business. As a result, he started "Kameleon Farms," a "multi-purpose farm" "to do hemp, organic soils." Savage identified a 2021 certificate from the Ohio Secretary of State for his business and a document reflecting a federal identification number for tax purposes for Kameleon Farms. To build inventory, Savage contacted Kindred Ranch in Tennessee, which he described as a business with a license to sell hemp products.

**{¶ 31}** In anticipation of documentary evidence that Savage sought to admit about what he had purchased in Tennessee, the following exchange occurred at sidebar:

[THE PROSECUTOR]: Defense is about to present - - I believe this is testimony with regards to drug tests and drug testing that was done on products this Defendant might purchase. There is no authentication of the test. We don't have a person here who did the test and a person here to talk about how the tests were performed, whether the tests were scientifically reliable. We don't have any of that information.

So I don't know how he's going to be able to introduce a document that purports to say that this product - - that exhibits the State has presented are hemp without bringing an expert in, the person who performed the test.

THE COURT: Counsel for defense.

[DEFENSE COUNSEL]: We discussed the knowingly element. This was

provided to him as part of the invoice in the other package from the farm in Tennessee. This shows he's buying legal hemp. It goes directly to one of the elements of the offense.

THE COURT: Even if that's what it says, how the - - the hemp that they received in 2019, how do you know that what they have in 2022 is the hemp they would have received in 2019?

[DEFENSE COUNSEL]: How do I know that? [Savage will] testify to that.

THE COURT: Well, then, what purpose does this document have?

[DEFENSE COUNSEL]: That shows the THC content; that he was knowingly buying hemp-derived THC, not hemp marijuana.

THE COURT: The court finds that, under the Evidence Rule 801(C), the document is hearsay because it's being offered in evidence to prove the truth of the matter asserted.

To the extent that there is a hearsay exception, the Court looked at records of regularly conducted activity under 803.67 [sic], and as the Weissenberger Ohio Evidence Courtroom Manual 2023 edition sets forth, [t]he business records exception contains its own distinct authentication requirement. Every piece of documentary evidence must be properly authenticated; that is, some evidence must be introduced to establish that the document is, in fact, what it purports to be.

So you don't have an authentication witness. And I don't believe that document can be self-authenticating under 902. This document is not to

be used.

[DEFENSE COUNSEL]: We would ask that it be proffered.

THE COURT: Yes, that's fine. It will be marked as it is marked, Defendant's Exhibit D.

{¶ 32} Savage then identified a purchase order from Kindred Ranch Hemp Company for hemp-derived items purchased in bulk for Kameleon Farms. He also identified a Tennessee Hemp Movement Permit to allow the hemp to be transported.

{¶ 33} According to Savage, he did not open a "brick and mortar" store because of the COVID-19 pandemic. He stated, "we thought that would be the best time to get our bulk amount. And when we found Kindred Ranch, they were actually selling out. They were going out of business and that's why we ended up getting several purchases." With respect to the "green vegetative material," the edibles, and the vapes, Savage testified that he did not believe he had purchased any marijuana products. In addition to Kindred Ranch, he stated that he had purchased materials from C.B. Distillery in Colorado, Hemp Wholesalers in New York, and many other companies, and that each purchase order had a "lab test that goes with it to verify what it is."

{¶ 34} Savage explained the amount of cash in his home by stating that he had never trusted banks and that, during COVID, "different countries were locking down bank accounts." Due to his military experience, Savage stated he had been privy to information about "government manipulation," and so he did not "trust a lot of the government functions for the people, as in banking, electronics of that nature." Savage also testified that he divided his money into envelopes designated for different things,

such as his children and savings. Savage stated that he had one bank account with four or five "subaccounts" for his wife and children. He denied that the cash in his home was from illegal drug sales.

{¶ 35} According to Savage, he received Social Security Income, military disability income, money for each dependent from the VA, and "dependent money" for each dependent from Social Security. These checks were deposited automatically, and Savage withdrew the amounts in cash. He also refinanced his home every couple of years "for investments" and to "draw all of [his] equity out." He stated that, in these transactions, "[t]hey would give [him] a check for $20,000, $30,000, $40,000," which he would deposit into his bank, use to pay expenses, and then withdraw the rest. He used money from his house "to make money for [his] family."

{¶ 36} Savage stated that the items of jewelry at his home were "family heirlooms." He testified that the ledger about which Guryko had testified represented his notes, "estimate projections of expenses," and attempt "to try to get the proper numbers to buy and sell . . . everything."

{¶ 37} Savage testified that he enjoyed owning the number of weapons on his property because he was "Military and law enforcement," but he did not use all of the weapons, and they were "all legal guns." He stated that some were purchased to pass down to his children or were gifts from his brothers.

{¶ 38} In response to Woolford's testimony about the THC levels in the substances found on his property, Savage stated that a product originally tested and sold as legal hemp could develop a higher THC content if exposed to heat, but in that circumstance, it

was "still a legal product under the 2018 Farm Bill." He reiterated that, when his products were purchased, they had all been "legally hemp-derived products from the company I purchased them from with the paperwork that they provided to me."

**{¶ 39}** On cross-examination, Savage stated that he had been declared permanently disabled in 2012 and received around $3,400 per month in disability payments. He supported his family with his disability income and investment income. His wife received around $1,200 from the VA to care for him. Savage testified that his annual income was between $74,000 and $82,000.

**{¶ 40}** Savage acknowledged that he had transported products from Kindred Ranch to his home around April 5, 2021. He testified that he had not sold a single product from that purchase.

**{¶ 41}** The following documents were admitted as defense exhibits: the Kameleon Farms, LLC Secretary of State Filing; the Department of Treasury Employer Identification Number document; the Hemp License for Kindred Farm Ranch, Inc.; and an April 5, 2021 Tennessee Hemp Movement Permit.

**{¶ 42}** The drug offenses of which Savage was convicted were as follows: Count 1, possession of hashish; Count 2; trafficking in hashish; Count 3, possession of hashish; Count 4, trafficking in hashish; Count 5, possession of marijuana; and Count 6, trafficking in marijuana (all with firearm specifications).

**{¶ 43}** R.C. 2925.11 addresses drug possession offenses. It specifies that anyone who knowingly obtains, possesses, or uses a controlled substance is guilty of possession of controlled substances. R.C. 2925.03 governs drug trafficking offenses and states that

anyone who knowingly sells or offers to sell a controlled substance, or prepares for shipment, ships, transports, delivers, prepares for distribution, or distributes a controlled substance, knowing or having reasonable cause to believe that the substance is intended for sale, is guilty of drug trafficking.

{¶ 44} Based on its findings that Savage was guilty of the drug offenses, the jury clearly credited the testimony of Sgt. Curnett, Woolford, and Agent Guryko over that of Savage, and we defer to the jury's assessment of credibility. Moreover, Savage mischaracterizes the record as to Woolford's testimony. She testified that legal hemp is defined as a cannabis plant with .3 percent THC, and that a scientifically-proven number, namely the ratio between THC size and THC-A size, was combined to determine total THC as defined in the Ohio Revised Code. She testified, to a reasonable degree of scientific certainty, that none of the vegetation she tested from Savage's property was legal hemp and that legal hemp cannot become marijuana by means of decarboxylation. In its judgment entry of conviction, the trial court noted: "While there is certainly evidence that the Defendant intended to establish a 'hemp business' and purchased hemp-level product at some point, there is no evidence that the felony drugs discovered at the Defendant's residence were the hemp products purchased in Tennessee." We agree.

{¶ 45} The jury could have reasonably concluded that the presence at Savage's home of large amounts of packaged illegal drugs, multiple unsecured and loaded firearms, and substantial amounts of cash in separate envelopes did not support a conclusion that Savage merely intended to sell legal hemp. Moreover, there was expert testimony from Guryko that jewelry and firearms, which were found in large amounts on

the premises, are commonly bartered for drugs, that the banking transactions were suspect, and that the scene at Savage's residence had features common to a drug trafficking operation. Moreover, Sgt. Curnette and Det. Sells recognized a strong odor of marijuana at Savage's residence, which undercut Savage's argument that it was hemp. While Savage testified that he had intended to open a business selling hemp and organic soils, there was no testimony about the presence of those porducts for sale at his residence.

{¶ 46} We conclude that Savage's convictions on counts one through six were not against the manifest weight of the evidence. The jury did not lose its way and create a manifest miscarriage of justice. Accordingly, Savage's first assignment of error is overruled.

**Exclusion of Evidence**

{¶ 47} We will consider Savage's second and third assignments of error together. In these assignments, Savage argues that the trial court abused its discretion in excluding "documentary evidence of the source of the vegetative material seized" at his property and violated his due process rights by preventing him from presenting a defense by excluding that documentary evidence. These arguments were based on the exclusion of Defense Exhibit D, which was purportedly "a lab result showing that the vegetative product was . . . hemp-derived THC." Savage acknowledges that the documents in the exhibit were "not self-authenticating" and could be considered hearsay, but he argues that "the test of the vegetative material . . . was wholly exculpatory" and would have led to his acquittal by the jury. According to Savage, the "only reason the [S]tate objected

to this document . . . [was] its explosive effect on the jury." He also argues that the exhibit, along with other documents he offered at trial, showed that he "went to great lengths to run a legal store for the sale of hemp-derived THC." The State responds that the court properly determined that the exhibit constituted inadmissible hearsay.

{¶ 48} "The admission or exclusion of relevant evidence is within the sound discretion of the trial court, and we review that decision for an abuse of discretion." *State v. Santana*, 2022-Ohio-4118, ¶ 25 (2d Dist.), citing *State v. Jali*, 2020-Ohio-208, ¶ 39 (2d Dist.). " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." (Citation omitted). *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157 (1990). It is well-settled that most abuses of discretion "will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 49} "Error may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected; and . . . the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Evid.R. 103(A)(2). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). Authenticity is normally demonstrated by extrinsic evidence unless the evidence is self-authenticating as provided in Evid.R. 902, which states that "[e]xtrinsic evidence as a condition precedent to admissibility is not required" for certain listed documents, such

as documents under seal, certified copies of public records, and newspapers.

{¶ 50} Hearsay is a statement made by someone other than the declarant while testifying, "offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). As a general rule, hearsay is not admissible into evidence. Evid. R. 802. Evid.R. 803(6), which the trial court considered, provides an exception to the hearsay rule for records of regularly conducted activity as follows:

A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

{¶ 51} Savage proffered Defense Exhibit D to establish that the marijuana found in his home was purchased as legal hemp. However, as defense counsel acknowledged, Savage lacked any independent witnesses to authenticate the contents of the document, such as the testing procedures used, the results obtained, their reliability, and whether the exhibit had been produced in the course of regular business

activity. There was also no independent witness to testify about whether the precise "hemp" represented in the exhibit was the same as that admitted into evidence, and the charges against Savage arose from the marijuana in his possession. The court reasonably found that the exhibit was hearsay not subject to an exception and was not self-authenticating. As such, no abuse of discretion is demonstrated in the exclusion of the evidence, and Savage's right to due process was not violated. Savage's second and third assignments of error are overruled.

## Fines and Court Costs

{¶ 52} Savage's fourth assignment of error is that the trial court erred in failing to consider his ability to pay the fine and court costs imposed, which were substantial. According to Savage, the court "concerned itself" with the amount of money found in his home, approximately $62,000, notwithstanding his testimony that he had saved that money, did not trust banks, and that there "were purposes for each of the amounts of money." The State responds that the fines the court imposed were within the statutory range pursuant to R.C. 2929.18 and R.C. 2929.28. The State also notes that Savage did not object at sentencing to the fines imposed and that the record shows that the trial court properly considered Savage's ability to pay the fines and costs.

{¶ 53} "Ordinarily, a failure to bring an error to the attention of the trial court at a time when the court could correct that error constitutes a waiver of all but plain error." *State v. Johnson,* 2005-Ohio-6826, ¶ 22 (2d Dist.), citing *State v. Wickline*, 50 Ohio St.3d 114 (1990). "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been different." *Id.* at ¶ 23, citing *State v. Long*,

53 Ohio St.2d 91 (1987) and *Wickline*. *See also* Crim.R. 52(B).

**{¶ 54}** Before imposing the fines at the sentencing hearing, the court noted:

In imposing the financial sanction, the Court has considered the Defendant's present and future ability to pay the financial obligation before the financial obligation was imposed. The Court notes the availability of the funds that are currently State exhibits. The Court is not going to ask the Defense, at this point, whether it wishes those moneys to be used to pay off any fines. If you do, you can file a motion with the Court to do that. But at this point the Court is going to impose a financial sanction and then leave it up to you guys how you want it paid.

**{¶ 55}** The judgment entry stated:

Regarding the Defendant's future ability to pay the amount of the financial obligations set forth herein, and in addition to the information provided by the pre-sentence investigation report and statements of the Prosecutor, Defense Counsel and Defendant at sentencing, the Court also considered that as an inmate, the Defendant would have the possibility of employment in inmate work programs established pursuant to R.C. §5145.16 and OAC §5120-3-01 through §5120-3-09.

**{¶ 56}** Savage does not contest the amounts of the fines imposed, and they were within the statutory range. R.C. 2929.18 governs financial sanctions. R.C. 2929.18(A) states that a sentencing court *may* impose a financial sanction or combination of financial sanctions set forth in that statute.

{¶ 57} Count 10, furnishing a firearm to a minor, was a fifth-degree felony; R.C. 2929.18(3)(e) authorizes a fine of $2,500 for a felony of the fifth degree, which the court imposed for that offense.

{¶ 58} The three drug trafficking offenses of which Savage was convicted were second-degree felonies; R.C. 2929.18(B)(1) states for a second-degree felony violation of any provision of R.C. Chapter 2925, the sentencing court *shall* impose upon the offender a mandatory fine. R.C. 2929.18(A)(3)(b) authorizes a maximum fine in the amount of $15,000 for a felony of the second degree. The court imposed "concurrent" mandatory fines of $15,000 on the trafficking offenses, Counts 2, 4, and 6.

{¶ 59} Finally, Savage's convictions for endangering children, Counts 7 and 8, were first-degree misdemeanors. R.C. 2929.28 governs financial sanctions for misdemeanors and authorizes a fine of not more than $1,000 for a misdemeanor of the first degree. The court imposed fines in that amount on Counts 7 and 8.

{¶ 60} The court imposed fines within the statutory ranges and considered Savage's present and future ability to pay financial sanctions. No error is demonstrated. Savage's fourth assignment of error is overruled.

{¶ 61} Having overruled all assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

EPLEY, P.J. and TUCKER, J., concur.